# Authority of the President Under Domestic and International Law to Use Military Force Against Iraq

The President possesses constitutional authority to use military force against Iraq to protect United States national interests. This independent constitutional authority is supplemented by congressional authorization in the form of the Authorization for Use of Military Force Against Iraq Resolution.

Using force against Iraq would be consistent with international law because it would be authorized by the United Nations Security Council or would be justified as anticipatory self-defense.

October 23, 2002

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT[*]

I. Background ............................................................................................ 145
II. Domestic Legal Authority for Use of Force Against Iraq ............................... 150
    A. Constitutional Authority ........................................................................ 150
    B. Statutory Authority ............................................................................... 153
        1. Public Law 102-1 .......................................................................... 153
        2. Public Law 105-235 ....................................................................... 158
        3. Public Law 107-40 ........................................................................ 159
    C. The War Powers Resolution .................................................................. 159
III. Authority Under International Law to Use Force Against Iraq ....................... 162
    A. U.N. Security Council Authorization ...................................................... 162
        1. The Cease-Fire, Material Breach, and Treaty Law............................. 163
        2. Remedies ..................................................................................... 167
        3. State Practice on Suspension in Response to Material Breach .......... 169
        4. Armistice Law .............................................................................. 173
        5. UNSCR 688.................................................................................. 176
    B. Anticipatory Self-Defense .................................................................... 177
        1. The *Caroline* Test.......................................................................... 180
        2. Necessity ..................................................................................... 182
        3. State Practice ............................................................................... 184
            a. Cuban Missile Crisis ............................................................... 184
            b. Osirak Reactor Strike .............................................................. 186
            c. 1986 Strike Against Libya........................................................ 187
            d. 1989 Intervention in Panama.................................................... 189
            e. 1993 Strike Against Iraq........................................................... 190
            f. 1998 Attack on Afghanistan and Sudan .................................... 191
        4. The Current Test........................................................................... 194

---

[*] Editor's Note: For the book edition of this memorandum opinion, some of the internet citations have been updated or replaced with citations of equivalent printed authorities.

    5. Iraq ................................................................................................. 195

IV. Conclusion ................................................................................................ 197

    You have asked our Office whether the President has the authority, under both domestic and international law, to use military force against Iraq. This memorandum confirms our prior advice to you regarding the scope of the President's authority.[1] We conclude that the President possesses constitutional authority to order the use of force against Iraq to protect our national interests. This independent authority is supplemented by congressional authorization in the form of the Authorization for Use of Military Force Against Iraq Resolution, Pub. L. No. 102-1, 105 Stat. 3 (1991), which supports the use of force to secure Iraq's compliance with its international obligations following the liberation of Kuwait, and the Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (2001), which supports military action against Iraq if the President determines Iraq provided assistance to the perpetrators of the terrorist attacks of September 11, 2001. In addition, using force against Iraq would be consistent with international law, because it would be authorized by the United Nations ("U.N.") Security Council, or would be justified as anticipatory self-defense.

    This memorandum is divided into three sections. First, we explain the background to the current conflict with Iraq, touching upon the U.N. Security Council resolutions related to the Persian Gulf War and its aftermath, and highlighting the situations in which the United States has used force against Iraq between 1991 and the present. Second, we discuss the President's authority under domestic law to direct military action against Iraq, examining both his constitutional authority and supplementary congressional support. Finally, we detail the justification under international law for the United States to use force against Iraq, considering the circumstances in which the U.N. Security Council has authorized such action and the scenarios in which it would be appropriate to use force in anticipatory self-defense.

---

[1] You asked us to render our opinion based on the constitutional and other legal authorities that would exist in the absence of new authorization from either Congress or the United Nations ("U.N.") Security Council. We note that on October 16, 2002, the President signed into law the Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. No. 107-243, 116 Stat. 1498, which authorizes the President to use force against Iraq to enforce relevant U.N. Security Council resolutions regarding Iraq and to defend the national security of the United States from the threat posed by Iraq. We have not considered here the legal effect of that resolution. As this memorandum makes clear, even prior to the adoption of the Resolution the President had sufficient constitutional and statutory authority to use force against Iraq. We also note that negotiations are ongoing in the U.N. Security Council on a new resolution regarding Iraq, but we do not address any of the proposed terms here.

## I. Background

Prior to examining the President's legal authority to use force in Iraq, it is useful to explain some of the background to the current conflict. On August 2, 1990, Iraq invaded Kuwait. The next day, the U.N. Security Council ("Security Council") passed U.N. Security Council Resolution ("UNSCR") 660, the first of many resolutions condemning Iraq's actions and demanding withdrawal from Kuwait. *See* S.C. Res. 660, U.N. Doc. S/RES/660 (Aug. 2, 1990). For months, the world community sought a diplomatic solution, including sanctions, to persuade Iraq to leave Kuwait. *See* Address to the Nation Announcing Allied Military Action in the Persian Gulf, 1 *Pub. Papers of Pres. George Bush* 42, 43 (Jan. 16, 1991).

On November 29, 1990, the Security Council adopted UNSCR 678, which gave Iraq until January 15, 1991 to implement UNSCR 660 fully. *See* S.C. Res. 678, U.N. Doc. S/RES/678 (Nov. 29, 1990). In the absence of compliance by Iraq, paragraph 2 of UNSCR 678 authorized member states "to use all necessary means to uphold and implement resolution 660 (1990) and all subsequent relevant resolutions and to restore international peace and security in the area." *Id.* Iraq refused to withdraw from Kuwait before the January 15th deadline, and Operation Desert Storm began the next day. Allied air forces commenced an attack on military targets in Iraq and Kuwait. Ground forces were introduced on February 23, 1991, and Iraq was expelled from Kuwait four days later. Exactly 100 hours after ground operations began, President George H.W. Bush suspended offensive combat operations. *See* Address to the Nation on the Suspension of Allied Offensive Combat Operations in the Persian Gulf, 1 *Pub. Papers of Pres. George Bush* 187 (Feb. 27, 1991).

On April 3, 1991, the U.N. Security Council adopted UNSCR 687, which established the conditions for a formal cease-fire suspending hostilities in the Persian Gulf. UNSCR 687 "reaffirm[ed] the need to be assured of Iraq's peaceful intentions" given Iraq's invasion and occupation of Kuwait, its prior use of chemical weapons and ballistic missiles in unprovoked attacks, and reports that it had attempted to acquire materials to build nuclear weapons. S.C. Res. 687, pmbl. ¶ 4, U.N. Doc. S/RES/687 (Apr. 3, 1991). To that end, section C of UNSCR 687 imposed a variety of conditions on Iraq. First, the Security Council "decide[d]" that Iraq must:

> unconditionally accept the destruction, removal, or rendering harmless, under international supervision, of:
>
> *(a)* All chemical and biological weapons and all stocks of agents and all related subsystems and components and all research, development, support and manufacturing facilities . . . ; [and]

> *(b)* All ballistic missiles with a range greater than [150] kilometres, and related major parts and repair and production facilities.

*Id*. ¶ 8. Second, Iraq must agree to "urgent, on-site inspection" to ensure its compliance with this requirement. *Id*. ¶ 9(a). Third, Iraq must "unconditionally undertake not to use, develop, construct or acquire" such weapons of mass destruction ("WMD") and their delivery systems. *Id*. ¶ 10. Finally, Iraq must "unconditionally agree not to acquire or develop nuclear weapons or nuclear-weapon[s]-usable material or any subsystems or components or any [related] research, development, support or manufacturing facilities," and to accept "urgent on-site inspection and the destruction, removal or rendering harmless as appropriate" of all such nuclear-related weapons or materials. *Id*. ¶ 12. To carry out on-site inspections of Iraq's WMD programs, the Resolution called for the establishment of a Special Commission ("UNSCOM") to act in cooperation with the International Atomic Energy Agency ("IAEA"), which was to take custody of all of Iraq's nuclear-weapons-usable materials. *Id*. ¶¶ 9, 13.[2] In addition, UNSCR 687 required Iraq, *inter alia*, to renounce international terrorism. *Id*. ¶ 32. On April 6, 1991, Iraq officially accepted the terms set forth in UNSCR 687, and a formal cease-fire went into effect between Iraq, Kuwait and the U.N. members who had cooperated with Kuwait under UNSCR 678, including the United States. *Id*. ¶ 33.

Toward the end of the Gulf War, Iraq brutally suppressed Kurdish insurrections throughout Iraqi Kurdistan, causing the flight of hundreds of thousands of civilians into Iran and Turkey. *See generally* Letter to Congressional Leaders on the Situation in the Persian Gulf, 1 *Pub. Papers of Pres. George Bush* 521, 521-22 (May 17, 1991). In response, the Security Council adopted UNSCR 688, which "condemn[ed]" the repression of the Iraqi civilian population and found that the consequences of such repression—"a massive flow of refugees towards and across international frontiers and . . . cross-border incursions"—threatened international peace and security in the region. S.C. Res. 688, U.N. Doc. S/RES/688 (Apr. 5, 1991). To aid the refugees who had fled northern Iraq, the United States joined the allied coalition in launching Operation Provide Comfort, which provided humanitarian relief for the Kurds. In addition, the coalition established a no-fly zone prohibiting Iraqi military aircraft from flying north of the 36th parallel. *See* Remarks on Assistance for Iraqi Refugees and a News Conference, 1 *Pub. Papers of Pres. George Bush* 378, 378-79 (Apr. 16, 1991). Due to increased repression of

---

[2] Significantly, UNSCR 687 also specifically "affirm[ed]" thirteen Security Council Resolutions relating to Iraq, including UNSCR 678, "except as expressly changed . . . to achieve the goals of [this] resolution, including a formal cease-fire." S.C. Res. 687, ¶ 1. This affirmance of UNSCR 678, which was not "expressly changed" by UNSCR 687, confirmed that its authorization to use force continued in effect after the cease-fire. Several years later, in UNSCR 949, the Security Council again "reaffirm[ed]" UNSCR 678, "in particular paragraph 2." S.C. Res. 949, pmbl. ¶ 1, U.N. Doc. S/RES/949 (Oct. 15, 1994).

the civilian population in 1992 by Saddam Hussein in both the northern and southern parts of Iraq, British, French and U.S. coalition forces began patrolling an additional no-fly zone south of the 32nd parallel to protect Iraqi Shiites. *See* Letter to Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 2 *Pub. Papers of Pres. George Bush* 1574, 1574-75 (Sept. 16, 1992). The no-fly zones were intended to assist in the monitoring of Iraqi compliance with UNSCR 687 and UNSCR 688, and to discourage significant Iraqi military operations against the civilian population. *See* Letter to Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 2 *Pub. Papers of Pres. George Bush* 2269, 2269-70 (Jan. 19, 1993); Letter to Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 1 *Pub. Papers of Pres. William J. Clinton* 715, 716 (May 21, 1993). Iraq does not accept the no-fly zones as legitimate and periodically threatens coalition forces patrolling the zones. The United States and Britain have responded by repeatedly attacking Iraqi surface-to-air missile sites and related facilities in self-defense. *See, e.g.*, Letter to Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 2 *Pub. Papers of Pres. George Bush* 2269, 2269 (Jan. 19, 1993); *Iraq's Compliance with United Nations Security Council Resolutions*, H.R. Doc. No. 107-185, at 4 (Jan. 24, 2002).

From its inception, UNSCOM encountered resistance from Iraq. On August 15, 1991, little more than three months after the adoption of UNSCR 687, the Security Council "condemn[ed]" Iraq's "serious violation" of a number of its obligations regarding the destruction and dismantling of its WMD program and of its agreement to cooperate with UNSCOM and the IAEA, and stated that the violation "constitutes a material breach of the relevant provisions of [UNSCR 687] which established a cease-fire and provided the conditions essential to the restoration of peace and security in the region." S.C. Res. 707, ¶ 1, U.N. Doc. S/RES/707 (Aug. 15, 1991). Shortly thereafter, President George H.W. Bush warned that the United States would not tolerate Iraq's misrepresentations regarding, and denial of U.N. access to, its WMD program: "[I]f necessary [the United States] will take action to ensure Iraqi compliance with the Council's decisions so as to fully implement Resolution 678's call for the restoration of international peace and security to the Persian Gulf region." Letter to Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 2 *Pub. Papers of Pres. George Bush* 1164, 1164-65 (Sept. 16, 1991). Several months later, on January 17, 1993, President Bush ordered the destruction by U.S. missiles of a nuclear facility near Baghdad, "to help achieve the goals of U.N. Security Council

Resolutions 687, 707 and 715[3] requiring Iraq to accept the inspection and elimination of its weapons of mass destruction and ballistic missiles." Letter to Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 2 *Pub. Papers of Pres. George Bush* 2269, 2270 (Jan. 19, 1993). Although the nuclear facility had been inspected, and some equipment had been removed, President Bush warned that it could be used again to support Iraq's nuclear weapons program. *Id.*

In addition to directing the use of force to respond to threats to coalition forces in the no-fly zones, President Clinton ordered military action against Iraq on three separate occasions. First, in June 1993, President Clinton ordered a cruise missile attack on the principal command-and-control facility of the Iraqi intelligence service ("IIS") in Baghdad. The strike was in response to "compelling evidence" that the IIS had directed and pursued a failed attempt to assassinate President George H.W. Bush in April of that year. Letter to Congressional Leaders on the Strike on Iraqi Intelligence Headquarters, 1 *Pub. Papers of Pres. William J. Clinton* 940 (June 28, 1993). President Clinton explained that the goal of the strike was "to target Iraq's capacity to support violence against the United States and other nations and to deter Saddam Hussein from supporting such outlaw behavior in the future." Address to the Nation on the Strike on Iraqi Intelligence Headquarters, 1 *Pub. Papers of Pres. William J. Clinton* 938, 938 (June 26, 1993).

Second, President Clinton ordered U.S. cruise missile strikes in September 1996 to respond to an Iraqi attack in northern Iraq ("Operation Desert Strike"). When U.S. intelligence revealed that Iraq had engaged in a military buildup near Irbil, the United States warned Iraq not to use military force. Iraq ignored the warning and stormed Irbil. In response, the United States extended the no-fly zone in southern Iraq from the 32nd to the 33rd parallel and conducted military strikes against fixed, surface-to-air missile sites, command-and-control centers, and air defense control facilities south of the 33rd parallel. *See* Letter for Newt Gingrich, Speaker of the House of Representatives, from President William J. Clinton 1-2 (Sept. 5, 1996) ("Gingrich Letter") (claiming authority under, *inter alia*, UNSCRs 678, 687, and 688). The strikes were designed to show Saddam Hussein that he must halt all actions that threaten international peace and security. *See id.* at 1.

Third, in December 1998, President Clinton directed missile and aircraft strikes against Iraq in response to Iraqi breaches of its obligations under various UNSCRs, particularly Iraq's failure to cooperate fully with U.N. inspections of its WMD program. *See* Letter to Congressional Leaders on the Military Strikes Against Iraq, 2 *Pub. Papers of Pres. William J. Clinton* 2195, 2195-96 (Dec. 18, 1998) (claiming authority under, *inter alia*, UNSCRs 678 and 687). The 1998

---

[3] UNSCR 715 approved UNSCOM and IAEA plans for inspecting Iraq's WMD program and demanded that Iraq unconditionally meet its obligations under the plans and give its full cooperation to international inspections. S.C. Res. 715, ¶ 1, U.N. Doc. S/RES/715 (Oct. 11, 1991).

strikes were the culmination of a stand-off between Iraq and the United Nations regarding Iraq's refusal to permit effective international inspections of its WMD program. In the fall of 1997, for example, Iraq demanded that all U.S. members of the UNSCOM inspection team depart Iraq immediately and asked that UNSCOM withdraw its "cover" for the U-2 reconnaissance aircraft flown by the United States as part of UNSCOM's efforts to detect Iraq's WMD program. *See* UNSCOM: Chronology of Main Events (Dec. 1999), *available at* www.un.org/ Depts/unscom/Chronology/chronologyframe.htm (last visited May 3, 2012); *see also* Michael L. Cornell, Comment, *A Decade of Failure: The Legality and Efficacy of United Nations Actions in the Elimination of Iraqi Weapons of Mass Destruction*, 16 Conn. J. Int'l L. 325, 337 & n.95 (2001). The Security Council responded by adopting UNSCR 1137, which "condemn[ed] the continued violations by Iraq of its obligations under the relevant resolutions to cooperate fully and unconditionally with [UNSCOM]," found that the situation continued to "constitute a threat to international peace and security," and warned that "serious consequences" would result if Iraq failed to comply unconditionally and immediately with its international obligations. S.C. Res. 1137, pmbl. ¶ 8, ¶ 1, U.N. Doc. S/RES/1137 (Nov. 12, 1997).

In early 1998, Iraq's continued intransigence prompted the United States to threaten military force to compel its compliance. *See Contemporary Practice of the United States Relating to International Law*, 93 Am. J. Int'l L. 470, 472 (Sean D. Murphy ed., 1999). Although U.N. Secretary General Kofi Annan secured a Memorandum of Understanding ("MOU") confirming Iraq's acceptance of all relevant Security Council resolutions and its reaffirmation to cooperate fully with UNSCOM and the IAEA in February 1998, Iraq formally halted all cooperation with UNSCOM at the end of October. *Id.* at 473. The Security Council responded by adopting UNSCR 1205, which condemned Iraq's decision as a "flagrant violation of resolution 687 . . . and other relevant resolutions." S.C. Res. 1205, ¶ 1, U.N. Doc. S/RES/1205 (Nov. 5, 1998). On November 15, the United States refrained from launching a massive missile attack against Iraq, only after Iraq committed to full cooperation with U.N. inspections. Remarks on the Situation in Iraq and an Exchange with Reporters, 2 *Pub. Papers of Pres. William J. Clinton* 2035 (Nov. 15, 1998). But despite Iraq's promises, on December 15, the Executive Director of UNSCOM reported that the Commission could not complete its mandate due to Iraq's obstructionism.

The next day, the United States and Britain launched a seventy-hour missile and aircraft bombing campaign against approximately one hundred targets in Iraq—facilities that were actively involved in WMD and ballistic missile activities, or that posed a threat to Iraq's neighbors or to U.S forces conducting the operation. *See* Letter to Congressional Leaders on the Military Strikes Against Iraq, 2 *Pub. Papers of Pres. William J. Clinton* 2195, 2195-96 (Dec. 18, 1998). President Clinton explained:

> I believe our action in Iraq clearly is in America's interest. Never again can we allow Saddam Hussein to develop nuclear weapons, poison gas, biological weapons, or missiles to deliver them. He has used such terrible weapons before against soldiers, against his neighbors, against civilians. And if left unchecked, he'll use them again.

The President's Radio Address, 2 *Pub. Papers of Pres. William J. Clinton* 2197, 2197 (Dec. 19, 1998). President Clinton warned that if UNSCOM were not allowed to resume its work, the United States would "remain vigilant and prepared to use force if we see that Iraq is rebuilding its weapons programs." Address to the Nation on Completion of the Military Strikes in Iraq, 2 *Pub. Papers of Pres. William J. Clinton* 2199, 2200 (Dec. 19, 1998). He also cautioned that the United States must be prepared to use force again if Saddam Hussein threatened his neighbors, challenged the no-fly zones, or moved against the Kurds in Iraq. *See* Address to the Nation Announcing Military Strikes on Iraq, 2 *Pub. Papers of Pres. William J. Clinton* 2182, 2184 (Dec. 16, 1998).

Since the 1998 airstrikes, Iraq has continued to refuse to permit U.N. inspections of its WMD program. In December 1999, the Security Council decided to disband UNSCOM and replace it with the United Nations Monitoring, Verification and Inspection Commission ("UNMOVIC"). S.C. Res. 1284, ¶ 1, U.N. Doc. S/RES/1284 (Dec. 17, 1999). Although the Security Council "decide[d]" that Iraq must allow UNMOVIC teams immediate, unconditional and unrestricted access to any and all areas, facilities, equipment, records and means of transport that they need to inspect in accordance with their mandate, *id.* ¶ 4, Iraq has not permitted UNMOVIC to conduct any inspections.

## II. Domestic Legal Authority for Use of Force Against Iraq

### A. Constitutional Authority

We have consistently advised that the Constitution grants the President unilateral power to take military action to protect the national security interests of the United States. *See generally The President's Constitutional Authority to Conduct Military Operations Against Terrorists and Nations Supporting Them*, 25 Op. O.L.C. 188 (2001) ("*President's Authority to Conduct Military Operations*").[4]

---

[4] *See also* Memorandum for Daniel J. Bryant, Assistant Attorney General, Office of Legislative Affairs, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Specter/Harkin Joint Resolution Calling for Congress to Vote on a Resolution for the Use of Force by the United States Armed Forces Against Iraq* (July 23, 2002); *Applying the War Powers Resolution to the War on Terrorism: Hearing Before the Subcomm. on the Constitution, Federalism, and Property Rights of the S. Comm. on the Judiciary*, 107th Cong. 7-13 (2002) (testimony of John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel); *Proposed Deployment of United States Armed Forces into Bosnia*, 19 Op. O.L.C. 327 (1995) ("*Bosnia Opinion*"); *Deployment of United States Armed*

Under Article II, Section 2, the President is the "Commander in Chief of the Army and Navy of the United States." U.S. Const. art. II, § 2. The Constitution also gives the President exclusive powers as the Chief Executive and the "sole organ of the federal government in the field of international relations." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936); *see also Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988) (the Supreme Court has "recognized 'the generally accepted view that foreign policy was the province and responsibility of the Executive'") (quoting *Haig v. Agee*, 453 U.S. 280, 293-94 (1981)). Although Article I vests in Congress the power to "raise and support Armies," "provide and maintain a Navy," and to appropriate funds to support the military—powers that give Congress effective control over the supply of military resources to the President as Commander in Chief[5]—as well as the power to issue formal declarations of war, U.S. Const. art. I, § 8, cls. 1, 11-13, Article II vests in the President, as Chief Executive and Commander in Chief, the constitutional authority to use such military forces as are provided to him by Congress to engage in military hostilities to protect the national interest of the United States. The Constitution nowhere requires for the exercise of such authority the consent of Congress. *Cf.* U.S. Const. art. I, § 10, cl. 3 ("No State shall, without the Consent of Congress, . . . engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay."); Articles of Confederation of 1778, art. IX, § 6, 1 Stat. 4, 8 ("The United States, in Congress assembled, shall never engage in a war . . . unless nine States assent to the same . . . ."). Thus, as then-Attorney General Robert Jackson explained more than sixty years ago, the President's authority as Commander in Chief "has long been recognized as extending to the dispatch of armed forces outside of the United States . . . for the purpose of protecting . . . American interests." *Training of British Flying Students in the United States*, 40 Op. Att'y Gen. 58, 62 (1941) (Jackson, A.G.).

Presidents have long undertaken military actions pursuant to their constitutional authority as Chief Executive and Commander in Chief and their constitutional

---

*Forces into Haiti*, 18 Op. O.L.C. 173 (1994) ("Haiti Opinion"); *Authority to Use United States Military Forces in Somalia*, 16 Op. O.L.C. 6 (1992) ("Somalia Opinion"); *Overview of the War Powers Resolution*, 8 Op. O.L.C. 271 (1984); *Presidential Power to Use the Armed Forces Abroad Without Statutory Authorization*, 4A Op. O.L.C. 185 (1980); Memorandum for Hon. Charles W. Colson, Special Counsel to the President, from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, *Re: The President and the War Power: South Vietnam and the Cambodian Sanctuaries* (May 22, 1970).

[5] We have also previously and consistently opined that Congress may not place conditions on its appropriations in such a manner as would interfere with the President's ability to exercise his constitutional powers over foreign relations and the military as Chief Executive and Commander in Chief. *See, e.g.*, *Issues Raised by Foreign Relations Authorization Bill*, 14 Op. O.L.C. 37, 42 n.3 (1990). For example, in 1996 this Office concluded that Congress could not forbid the Department of Defense from spending appropriated funds on certain activities we had deemed to fall within the President's constitutional authority as Commander in Chief. *See Placing of United States Armed Forces Under United Nations Operational or Tactical Control*, 20 Op. O.L.C. 182 (1996).

authority to conduct U.S. foreign relations. In fact, the establishment of a large peacetime military force in the twentieth century has given rise to numerous unilateral exercises of military force grounded solely in the President's constitutional authority. For example, the deployment of U.S. troops in the Korean War by President Truman was undertaken without congressional authorization. *See* Bosnia Opinion, 19 Op. O.L.C. at 331 n.5. More recently, when President Clinton directed the extensive and sustained 1999 air campaign in the Former Republic of Yugoslavia, he relied solely on his "constitutional authority to conduct U.S. foreign relations and as Commander in Chief and Chief Executive." Letter to Congressional Leaders Reporting on Airstrikes Against Serbian Targets in the Federal Republic of Yugoslavia (Serbia and Montenegro), 1 *Pub. Papers of Pres. William J. Clinton* 459, 460 (Mar. 26, 1999). As we recently explained, "[t]he role of practice" in determining the proper allocation of authority between the political branches "is heightened in dealing with issues affecting foreign affairs and national security, where 'the Court has been particularly willing to rely on the practical statesmanship of the political branches when considering constitutional questions.'" *President's Authority to Conduct Military Operations*, 25 Op. O.L.C. at 202 (quoting *Whether Uruguay Round Agreements Required Ratification as a Treaty*, 18 Op. O.L.C. 232, 234 (1994)); *see, e.g.*, *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981); *Haig v. Agee*, 453 U.S. 280, 292-94 (1981).

Accordingly, we believe that the President's constitutional authority to undertake military action to protect the national security interests of the United States is firmly established in the text and structure of the Constitution and in Executive Branch practice. Thus, to the extent that the President were to determine that military action against Iraq would protect our national interests, he could take such action based on his independent constitutional authority; no action by Congress would be necessary. For example, were the President to conclude that Iraq's development of WMD might endanger our national security because of the risk that such weapons either would be targeted against the United States, or would be used to destabilize the region, he could direct the use of military force against Iraq to destroy its WMD capability. Or, were it the President's judgment that a change of regime in Iraq would remove a threat to our national interests, he could direct the use of force to achieve that goal.[6] Were the President to take such action, he would be acting consistently with the historical practice of the Executive Branch.[7]

---

[6] These examples are intended to be illustrative and non-exclusive.

[7] We should note that there is almost no judicial discussion of the principles we have examined here. As we have recently explained, various procedural obstacles make it unlikely that a court would reach the question of the President's constitutional power to engage the U.S. Armed Forces in military hostilities, regardless of whether the suit is brought by a Member of Congress or a private citizen. *See* Letter for Alberto R. Gonzales, Counsel to the President, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel (Sept. 10, 2002); *see also Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir.), *cert. denied*, 531 U.S. 815 (2000) (Kosovo); *Holtzman v. Schlesinger*, 484 F.2d 1307 (2d Cir.

## B. Statutory Authority

At times throughout our history, the President's constitutional authority to use force has been buttressed by statute. Such statutory support is not necessary in light of the President's independent constitutional authority to direct military action. *See* Statement on Signing the Resolution Authorizing the Use of Military Force Against Iraq, 1 *Pub. Papers of Pres. George Bush* 40 (Jan. 14, 1991) ("my request for congressional support did not, and my signing [Public Law 102-1] does not, constitute any change in the long-standing positions of the executive branch on . . . the President's constitutional authority to use the Armed Forces to defend vital U.S. interests"); *see also* Bosnia Opinion, 19 Op. O.L.C. at 335 ("the President has authority, without specific statutory authorization, to introduce troops into hostilities in a substantial range of circumstances"); Haiti Opinion, 18 Op. O.L.C. at 175-76 ("the President may introduce troops into hostilities or potential hostilities without prior authorization by the Congress"). Nonetheless, congressional support of presidential action removes all doubt of the President's power to act. According to the analysis set forth by Justice Jackson in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635-37 (1952) (Jackson, J., concurring), and later followed and interpreted by the Supreme Court in *Dames & Moore*, the President's power in such a case would be "at its maximum." *See President's Authority to Conduct Military Operations*, 25 Op. O.L.C. at 210. Were the President to direct military action against Iraq, he would be acting at the apex of his power because, as we discuss below, his constitutional authority to use such force is supplemented by congressional authorization.

### 1. Public Law 102-1

On January 14, 1991, shortly before the United States and allied nations began Operation Desert Storm, Congress enacted Public Law 102-1, the Authorization for Use of Military Force Against Iraq Resolution. Section 2(a) authorizes the President "to use United States Armed Forces pursuant to United Nations Security Council Resolution 678 (1990) in order to achieve implementation of Security Council Resolutions 660, 661, 662, 664, 665, 666, 667, 669, 670, 674, and 677." 105 Stat. at 3.[8] As explained above, UNSCR 678, in turn, authorizes member

---

1973) (Vietnam); *Luftig v. McNamara*, 373 F.2d 664, 665-66 (D.C. Cir. 1967) (Vietnam); *Ange v. Bush*, 752 F. Supp. 509 (D.D.C. 1990) (Persian Gulf War); *Crockett v. Reagan*, 558 F. Supp. 893 (D.D.C. 1982) (El Salvador); *cf. Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952); *Johnson v. Eisentrager*, 339 U.S. 763, 789 (1950). A federal district court recently dismissed *sua sponte* a suit filed on August 27, 2002 to enjoin the President from engaging in military action against Iraq absent a declaration of war or other extenuating circumstances on the grounds of lack of standing and the political question doctrine. *See Mahorner v. Bush*, 224 F. Supp. 2d 48 (D.D.C. 2002).

[8] Section 2(b) of Public Law 102-1 conditions the authority granted in section 2(a) on a report to Congress by the President certifying that the United States has exhausted all diplomatic and peaceful

states "to use all necessary means to uphold and implement resolution 660 (1990) and all subsequent relevant resolutions and to restore international peace and security in the area." S.C. Res. 678, ¶ 2. The other resolutions listed in Public Law 102-1 relate to Iraq's invasion of Kuwait on August 2, 1990 and are identical to the resolutions "recall[ed] and reaffirm[ed]" in UNSCR 678.[9]

By authorizing the use of U.S. Armed Forces "pursuant to" UNSCR 678, Public Law 102-1 sanctions not only the employment of the methods approved in that resolution—i.e., "all necessary means"—but also the two objectives outlined therein—that is, "to uphold and implement resolution 660 (1990) and all subsequent relevant resolutions and to restore international peace and security in the area." S.C. Res. 678, ¶ 2.[10] Two of the most important "subsequent relevant

---

avenues for obtaining Iraq's compliance with the relevant UNSCRs and that those efforts have not been and would not be successful in obtaining compliance. 105 Stat. at 3-4. President Bush submitted such a report on January 16, 1991. Letter to Congressional Leaders Transmitting a Report Pursuant to the Resolution Authorizing the Use of Force Against Iraq, 1 *Pub. Papers of Pres. George Bush* 42 (Jan. 16, 1991). The 1991 report satisfies the requirement in section 2(b) with respect to all uses of force against Iraq consistent with Public Law 102-1, and thus additional 2(b) reports were not filed prior to the use of force against Iraq in 1993, 1996 or 1998.

Section 2(c) explicitly provides that section 2 of Public Law 102-1 constitutes specific statutory authorization within the meaning of the War Powers Resolution. 105 Stat. at 4.

[9] *See* S.C. Res. 660, ¶ 12 (1990) (demanding that Iraq withdraw all of its forces to their positions prior to Iraq's August 2, 1990 invasion of Kuwait); S.C. Res. 661, ¶ 3, U.N. Doc. S/RES/661 (Aug. 6, 1990) (establishing oil embargo and sanctions regime against Iraq and Kuwait); S.C. Res. 662, ¶ 1, U.N. Doc. S/RES/662 (Aug. 9, 1990) (deciding that Iraq's annexation of Kuwait has no legal validity); S.C. Res. 664, ¶ 1, U.N. Doc. S/RES/664 (Aug. 18, 1990) (demanding that Iraq permit and facilitate the immediate departure from Kuwait of third-party nationals); S.C. Res. 665, U.N. Doc. S/RES/665 (Aug. 25, 1990) (calling upon allied nations to use necessary measures to enforce embargo established in UNSCR 661); S.C. Res. 666, U.N. Doc. S/RES/666 (Sept. 13, 1990) (implementing sanctions regime and the humanitarian needs exception); S.C. Res. 667, U.N. Doc. S/RES/667 (Sept. 16, 1990) (demanding that Iraq immediately protect safety of diplomatic and consular personnel and premises in Kuwait); S.C. Res. 669, U.N. Doc. S/RES/669 (Sept. 24, 1990) (relating to Jordan's request for relief from effects of implementing oil embargo and sanctions regime); S.C. Res. 670, U.N. Doc. S/RES/670 (Sept. 25, 1990) (regulating aircraft transporting cargo to Iraq or Kuwait and reaffirming Iraq's liability for grave breaches of the Geneva Convention Relative to the Protection of Civilian Persons in Time of War); S.C. Res. 674, U.N. Doc. S/RES/674 (Oct. 29, 1990) (condemning Iraqi mistreatment of Kuwaiti and third-party nationals and inviting collection of materials to bring charges against Iraq for its violations of international law); S.C. Res. 677, U.N. Doc. S/RES/677 (Nov. 28, 1990) (condemning Iraqi attempts to destroy demographic composition of Kuwait and Kuwaiti civil records).

[10] Although it might be argued that, due to the cease-fire formally adopted in UNSCR 687, UNSCR 678's authorization to use force is no longer in effect, and therefore Public Law 102-1 may not be relied upon as statutory authorization to use force against Iraq, such arguments are not persuasive. First, the Security Council has reaffirmed UNSCR 678 three times, twice in 1991 and again in 1994. *See supra* note 2; S.C. Res. 686, ¶ 1, U.N. Doc. S/RES/686 (Mar. 2, 1991) (affirming that UNSCR 678 "continue[s] to have full force and effect"). Significantly, the Security Council reaffirmed UNSCR 678 in UNSCR 687 itself. Second, because the cease-fire is akin to an armistice, which is a suspension of hostilities rather than a termination of the state of war, *see Ludecke v. Watkins*, 335 U.S. 160, 167 (1948) ("War does not cease with a cease-fire order."), the cease-fire did not terminate UNSCR 678's authorization to use force. Instead, general principles of armistice law permit the parties to the cease-fire to resume hostilities under certain conditions, pursuant to the authorization in UNSCR 678. *See*

resolutions" are UNSCR 687, which requires, *inter alia*, the inspection and destruction of Iraq's WMD program, and UNSCR 688, which demands that Iraq halt the repression of its civilian population. The second purpose for UNSCR 678, the restoration of peace and security to the Persian Gulf region, depends, at a minimum, on the effective implementation of both of these resolutions, although UNSCR 678 is not limited to implementing these two resolutions. *See, e.g.*, S.C. Res. 687, pmbl. ¶ 25 ("bear[ing] in mind [the] objective of restoring international peace and security in the area"); S.C. Res. 688, ¶ 2 (end to repression would "contribut[e] to removing the threat to international peace and security in the region").

The President could, consistent with Public Law 102-1, determine that using force in Iraq was necessary to implement the terms of UNSCR 687 and thereby to restore international peace and security to the region. Under Public Law 102-1, the President also could authorize force to prevent the repression of Iraqi civilians condemned in UNSCR 688, i.e., repression that threatens international peace and security by contributing to cross-border incursions and migration of refugees. Given Saddam Hussein's history of intransigence and refusal to cooperate with inspections of Iraq's WMD program and his continued repression of Iraqi civilians, the President could determine that a change of regime in Iraq is necessary to implement UNSCR 687 and thereby restore international peace and security to the region. Were the President to take any of these actions, he would be acting at the zenith of his authority because it would include "all that he possesses in his own right plus all that Congress can delegate." *Youngstown Sheet & Tube*, 343 U.S. at 635 (Jackson, J., concurring) (footnote omitted).

It could be argued that Iraq's expulsion from Kuwait in February 1991 by the United States and the allied nations fully implemented the UNSCRs listed in Public Law 102-1, and that therefore the authorization in section 2(a) for the use of U.S. Armed Forces has expired. Subsequent congressional legislation demonstrates, however, that the authorization in Public Law 102-1 remains in effect. First, the same Congress that enacted Public Law 102-1 twice expressed its "sense" that Public Law 102-1 continued to authorize the use of force even after Iraq's withdrawal from Kuwait.[11] Enacted on December 5, 1991, section 1095 of

---

*infra* Part III.A.4. Third, the objectives set forth in resolution 678 have not yet been achieved; in particular, Iraq has not complied with its cease-fire obligations, and consequently international peace and security have not been restored to the region. Finally, unlike some UNSCRs authorizing the use of force, *see, e.g.*, S.C. Res. 1031, U.N. Doc. S/RES/1031 (Dec. 15, 1995) (Bosnia); S.C. Res. 929, U.N. Doc. S/RES/929 (June 22, 1994) (Rwanda); S.C. Res. 814, U.N. Doc. S/RES/814 (Mar. 26, 1993) (Somalia), UNSCR 678 contains no temporal limit on its authorization.

[11] Although a "sense of the Congress" resolution is hortatory and does not give the President authority he would not otherwise posses, the views of Congress detailed below are evidence of Congress's understanding of the scope of such authority. *Cf.* Somalia Opinion, 16 Op. O.L.C. at 13 & n.6 ("sense of Congress" that President should, *inter alia*, "ensure" and "secure" the provision of

the National Defense Authorization Act for Fiscal Years 1992 and 1993, Pub. L. No. 102-190, 105 Stat. 1290, 1488 ("1992-1993 Defense Authorization Act"), contains a congressional finding that Iraq is violating UNSCR 687's requirements relating to its WMD program and expresses Congress's sense that "the Congress supports the use of all necessary means to achieve the goals of Security Council Resolution 687 as being consistent with the Authorization for Use of Military Force Against Iraq Resolution (Public Law 102-1)."[12] And section 1096 of the 1992-1993 Defense Authorization Act expresses the same Congress's "sense" that "Iraq's noncompliance with United Nations Security Resolution 688 constitutes a continuing threat to the peace, security, and stability of the Persian Gulf region . . . and [that] the Congress supports the use of all necessary means to achieve the goals of United Nations Security Council Resolution 688," which condemns the repression of the Iraqi civilian population, "consistent with all relevant United Nations Security Council Resolutions and . . . Public Law 102-1." 105 Stat. at 1489. Second, in 1999, Congress amended Public Law 102-1 to extend the reporting requirements from every 60 days to every 90 days, thereby indicating that the law continues in effect. *See* Consolidated Appropriations Act, 2000, Pub. L. No. 106-113, div. B, § 1000(a)(7), 113 Stat. 1501, 1536 (1999).

In addition, Executive Branch practice confirms that Public Law 102-1 continues to be in effect and to provide statutory authority for the President to implement applicable Security Council Resolutions, including UNSCRs 678, 687, and 688. Consistent with the reporting requirement in section 3 of Public Law 102-1, President Bush and his two predecessors have written to Congress at regular intervals to report on the status of efforts to secure Iraqi compliance with the applicable Security Council resolutions.[13] This practice has gone unchallenged by Congress.

---

emergency humanitarian assistance in Somalia demonstrates that Congress recognized the President's authority to use military force to accomplish that purpose).

[12] Section 1095(b) also expresses the sense of Congress that:

(1) Iraq's noncompliance with United Nations Security Council Resolution 687 constitutes a continuing threat to the peace, security, and stability of the Persian Gulf region; [and]

(2) the President should consult closely with the partners of the United States in the Desert Storm coalition and with the members of the United Nations Security Council in order to present a united front of opposition to Iraq's continuing noncompliance with Security Council Resolution 687.

*Id*.

[13] *See, e.g.*, Letter to Congressional Leaders Transmitting a Report on Iraq's Compliance with United Nations Security Council Resolutions, 1 *Pub. Papers of Pres. George W. Bush* 110 (Jan. 23, 2002); Letter to Congressional Leaders Transmitting a Report on Iraq's Compliance with United Nations Security Council Resolutions, 37 *Weekly Comp. Pres. Doc.* 1463 (Oct. 11, 2001); Letter to Congressional Leaders Transmitting a Report on Iraq's Compliance with United Nations Security Council Resolutions, 2 *Pub. Papers of Pres. William J. Clinton* 1678 (Oct. 1, 1999); Letter to

Even more significantly, President George H.W. Bush and President Clinton authorized the use of force on several occasions under Public Law 102-1 after the successful completion of Operation Desert Storm. For example, in 1998, President Clinton directed missile and aircraft strikes against Iraq "under" Public Law 102-1. Letter to Congressional Leaders on the Military Strikes Against Iraq, 2 *Pub. Papers of Pres. William J. Clinton* 2195, 2196 (Dec. 18, 1998). Two years earlier, in September 1996, President Clinton reported to Congress that he had ordered U.S. cruise missile strikes "consonant with" Public Law 102-1 and section 1096 of the 1992-1993 Defense Authorization Act. Gingrich Letter at 1. President Bush also reported to Congress that he had ordered the 1992 participation of the United States in the enforcement of the southern no-fly zone in Iraq "consistent with" Public Law 102-1. Letter to Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 2 *Pub. Papers of Pres. George Bush* 1574, 1575 (Sept. 16, 1992). Congress has acquiesced in each of these uses of force.[14]

In sum, both legislation passed by Congress and the consistent practice of the Executive Branch indicate that the authorization to use force in Public Law 102-1 has survived the cease-fire with Iraq. Although congressional authorization is not constitutionally required before the President may direct military action against Iraq in response to threats to the national security and foreign policy of the United

---

Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 1 *Pub. Papers of Pres. William J. Clinton* 1046 (June 6, 1994); Letter to Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 2 *Pub. Papers of Pres. George Bush* 1478 (Nov. 15, 1991); Letter to Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 2 *Pub. Papers of Pres. George Bush* 1164 (Sept. 16, 1991); Letter to Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 2 *Pub. Papers of Pres. George Bush* 896 (July 16, 1991).

[14] In May 1998, Congress expressed its "sense" that none of the funds provided by the 1998 Supplemental Appropriations and Rescissions Act

> may be made available for the conduct of offensive operations by United States Armed Forces against Iraq for the purpose of obtaining compliance by Iraq with United Nations Security Council Resolutions relating to inspection and destruction of weapons of mass destruction in Iraq unless such operations are specifically authorized by a law enacted after the date of enactment of this Act.

1998 Supplemental Appropriations and Rescissions Act, Pub. L. No. 105-174, § 17, 112 Stat. 58, 66. This is only a "sense" of Congress that is not binding. *See Boos v. Barry*, 485 U.S. 312, 327-28 (1988); *Lyng v. N.W. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 455 (1988); *see also Carriage of Agricultural Products in United States Vessels Where Exportation Is Financed by Government*, 37 Op. Att'y Gen. 546, 548 (1934) ("In view of the fact, however, that the word 'sense' [as used in the term 'sense of Congress'] is so well understood to mean 'opinion' and since the Congress has used the word in the Resolution, I am unwilling to believe that it intended to make the Resolution mandatory."). A few months later, the same Congress enacted a Joint Resolution "urg[ing]" President Clinton "to take appropriate action, in accordance with the Constitution and relevant laws of the United States, to bring Iraq into compliance" with its obligations under various U.N. Security Council Resolutions relating to Iraq's WMD program. Pub. L. No. 105-235, 112 Stat. at 1541.

States, the President would be acting with the support of Congress were he to direct such action pursuant to Public Law 102-1.

### 2. Public Law 105-235

Public Law 105-235, a Joint Resolution finding that Iraq "is in material and unacceptable breach of its international obligations," and "urg[ing]" President Clinton "to take appropriate action, in accordance with the Constitution and relevant laws of the United States, to bring Iraq into compliance," also arguably expresses Congress's support for the President to direct military action against Iraq. 112 Stat. 1538, 1541 (1998). The resolution contains multiple "whereas" clauses detailing almost two dozen Security Council findings of Iraqi violations of its WMD obligations and concluding that "Iraq's continuing weapons of mass destruction programs threaten vital United States interests and international peace and security." *Id*. at 1540. Although the Joint Resolution does not specifically authorize the use of force, and cautions that any action taken must comply with the Constitution and relevant laws, insofar as the President determines that directing military action against Iraq is "appropriate . . . to bring Iraq into compliance with its international obligations," and consistent with the Constitution and relevant U.S. law, Congress has expressed its support for such action. *Id*. at 1541. In addition, subsequent legislation passed by the same Congress that enacted Public Law 105-235 reflects at least implicit support for military action. In the Iraq Liberation Act, Congress noted with approval Public Law 105-235's recommendation that the President take appropriate action. *See* Iraq Liberation Act of 1998, Pub. L. No. 105-338, 112 Stat. 3178. Significantly, the Iraq Liberation Act was passed shortly after President Clinton submitted his September 1998 report under Public Law 102-1, which made clear that military options were "on the table" if Iraq did not resume cooperation with the U.N. inspection regime. *See* Letter to Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 2 *Pub. Papers of Pres. William J. Clinton* 1519, 1520 (Sept. 3, 1998). Read in this context, Public Law 105-235 grants at least implicit congressional authorization for the President to use force.[15]

---

[15] With respect to using force to facilitate a change of regime in Iraq, we note that in the Iraq Liberation Act Congress expressed its view that "[i]t should be the policy of the United States to support efforts to remove the regime headed by Saddam Hussein . . . in Iraq." Pub. L. No. 105-338, § 3, 112 Stat. at 3179. While the Act focuses on the provision of humanitarian, military, and broadcast assistance to Iraqi opposition forces, rather than direct military action by U.S. Armed Forces, it reflects congressional support for a change of regime in Iraq.

Congressional support for the use of force against Iraq is also reflected in House Resolution 322, 105th Cong. (1997) (enacted). Passed against the backdrop of continued Iraqi interference with U.N. inspections of its WMD programs, that resolution expressed the sense of the House of Representatives that the United States should, if necessary, take military action to compel Iraqi compliance with UNSCRs. *Id*. House Resolution 322 recommended that, if diplomatic efforts proved unsuccessful, any

### 3. Public Law 107-40

Public Law 102-1 and Public Law 105-235 are not the only potential sources of congressional support for a decision by the President to use force against Iraq; there could be situations in which military action against Iraq would be statutorily authorized pursuant to Public Law 107-40, the "Authorization for Use of Military Force" that was enacted shortly after the terrorist attacks of September 11, 2001. Public Law 107-40 authorizes the President to use "all necessary and appropriate force" against those nations, organizations or persons whom he determines "planned, authorized, committed, or aided the [September 11th] terrorist attacks . . . or harbored such organizations or persons, in order to prevent any future acts of international terrorism against the United States by such nations, organizations or persons." 115 Stat. at 224. Were the President to determine that Iraq provided assistance to the perpetrators of the September 11th attacks, this authorization would apply to the use of military force against Iraq.[16]

### C. The War Powers Resolution

Under the 1973 War Powers Resolution, 50 U.S.C. §§ 1541-1548 (1994) ("WPR"), whenever U.S. Armed Forces are deployed for combat, the President shall submit a written report to Congress within forty-eight hours. 50 U.S.C. § 1543(a). Under section 5(b), the President shall terminate any continuous and sustained use of U.S. Armed Forces within sixty days unless Congress has declared war, enacted a specific authorization for such use of U.S. Armed Forces, or extended the sixty-day period or unless Congress cannot meet because of an armed attack on the United States. *Id*. § 1544(b). To the extent that Public Law 102-1 or Public Law 107-40 authorizes the actions being contemplated by the President, those resolutions explicitly state that they satisfy the requirements of section 5(b). Insofar as any of the military options being contemplated fall outside the scope of the authorizations in Public Law 102-1 and Public Law 107-40, and instead would be conducted solely on the basis of the President's independent constitutional authority, significant constitutional issues regarding the sixty-day clock would be raised.

"[E]very President has taken the position that [the WPR] is an unconstitutional infringement by the Congress on the President's authority as Commander-in-Chief." Richard F. Grimmet, Cong. Research Serv., IB81050, *War Powers Resolution: Presidential Compliance* 2 (updated Sept. 10, 2002); *see also Overview of the War Powers Resolution*, 8 Op. O.L.C. 271, 281-83 (1984) (listing

---

military action be undertaken with "the broadest feasible multinational support," but recognized that, if necessary, the United States should take unilateral military action. *Id*.

[16] Section 2(b)(1) explicitly provides that section 2 of Public Law 107-40 constitutes specific statutory authorization within the meaning of the War Powers Resolution. 115 Stat. at 224.

examples of President's introduction of U.S. Armed Forces into actual or imminent hostilities or hostile territory, without complying with the WPR's reporting requirements, that took place during the Nixon, Ford, Carter, and Reagan Administrations). Indeed, the War Powers Resolution was enacted over a presidential veto based on constitutional objections as well as foreign policy concerns. *See* Veto of the War Powers Resolution, *Pub. Papers of Pres. Richard Nixon* 893 (Oct. 24, 1973). As President Nixon explained in justifying his veto:

> the restrictions which this resolution would impose upon the authority of the President are both unconstitutional and dangerous to the best interests of our Nation. . . . [The resolution] would attempt to take away, by a mere legislative act, authorities which the President has properly exercised under the Constitution for almost 200 years. . . . The only way in which the constitutional powers of a branch of the Government can be altered is by amending the Constitution—and any attempt to make such alterations by legislation alone is clearly without force.

*Id.*; *see also* Statement on Signing the Resolution Authorizing the Use of Military Force Against Iraq, 1 *Pub. Papers of Pres. George Bush* 40 (Jan. 14, 1991) (preserving "long-standing positions of the executive branch on . . . the constitutionality of the War Powers Resolution").[17]

This Office has never formally opined on the constitutionality of the WPR; we have, however, questioned the WPR's constitutionality on numerous occasions. *See, e.g.*, *Overview of the War Powers Resolution*, 8 Op. O.L.C. at 274 ("The Executive Branch has taken the position from the very beginning that § 2(c) of the WPR does not constitute a legally binding definition of Presidential authority to deploy our armed forces."); *Executive Power with Regard to the Libyan Situation*, 5 Op. O.L.C. 432, 441 (1981) ("We do not believe . . . that the purpose and policy statement should be construed to constrain the exercise of the President's constitutional power."); *cf. Presidential Power to Use the Armed Forces Abroad Without Statutory Authorization*, 4A Op. O.L.C. 185, 195 (1980) ("there may be applications [of the reporting or consultation requirements of WPR] which raise constitutional questions"); *Supplementary Discussion of the President's Powers Relating to the Seizure of the American Embassy in Iran*, 4A Op. O.L.C. 123, 128 (1979) (same); *Presidential Powers Relating to the Situation in Iran*, 4A Op. O.L.C. 115,

---

[17] On one occasion, President Carter did state that WPR's imposition of a sixty-day limitation on military operations absent congressional authorization was constitutional. "Ask President Carter": Remarks During a Telephone Call-in Program on the CBS Radio Network, 1 *Pub. Papers of Pres. Jimmy Carter* 291, 324 (Mar. 5, 1977) (noting that WPR sixty-day rule was an "appropriate reduction" in the President's power). President Carter may have relied on OLC advice for his statement. *See infra* note 18.

121 (1979) ("The Resolution includes in its statement of purposes and policy a list of situations in which the President is authorized to introduce the armed forces into hostilities or situations of imminent hostility. . . . However, we do not consider that the purpose and policy statement should be construed to constrain the exercise of the President's constitutional power in this instance.") (citation omitted).[18] Most recently, this Office has stated that "action taken by the President pursuant to the constitutional authority recognized in [section] 2(c)(3) cannot be subject to the substantive requirements of the WPR." *President's Authority to Conduct Military Operations*, 25 Op. O.L.C. at 211.[19]

Finally, we note that the WPR has been controversial ever since its enactment in 1973 and has been the subject of litigation when Presidents have used military force, allegedly in violation of the WPR. *See, e.g.*, *Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000); *Ange v. Bush*, 752 F. Supp. 509 (D.D.C. 1990); *Sanchez Espinoza v. Reagan*, 568 F. Supp. 596 (D.D.C. 1983), *aff'd*, 770 F.2d 202 (D.C. Cir. 1985); *Crockett v. Reagan*, 558 F. Supp. 893 (D.D.C. 1982), *aff'd*, 720 F.2d 1355 (D.C. Cir. 1983). To date, no court that we are aware of has ever reached a judgment on the merits; cases have been dismissed on the basis of a variety of procedural defects, including lack of standing, lack of ripeness, and the political question doctrine. *See* Grimmet, IB81050, *War Powers Resolution* at 2 ("The courts have not directly addressed [whether WPR is an unconstitutional infringement by the Congress on the President's authority as Commander in Chief]."). If the President were to take military action without complying with the WPR, it is likely that litigation would be brought. We think it is unlikely, however, that a court would rule on the merits of the WPR.

_____

[18] Although this Office has long questioned the constitutionality of the WPR, we have not done so consistently. *Compare Presidential Power to Use the Armed Forces Abroad*, 4A Op. O.L.C. at 196 ("We believe that Congress may, as a general constitutional matter, place a 60-day limit on the use of our armed forces as required by the provisions of § 1544(b) of the Resolution. The Resolution gives the President the flexibility to extend that deadline for up to 30 days in cases of 'unavoidable military necessity.' This flexibility is, we believe, sufficient under any scenarios we can hypothesize to preserve his constitutional function as Commander-in-Chief. The practical effect of the 60-day limit is to shift the burden to the President to convince the Congress of the continuing need for the use of our armed forces abroad. We cannot say that placing that burden on the President unconstitutionally intrudes upon his executive powers."), *with Authorization for Continuing Hostilities in Kosovo*, 24 Op. O.L.C. 327, 327-28 n.1 (2000) ("Previous Administrations have expressed different views concerning the constitutionality of the WPR. . . . In light of our conclusion that Congress lawfully authorized continued hostilities beyond the 60-day statutory limit, we have no occasion to consider any constitutional arguments that might be made.") (citations omitted).

[19] Section 2(c)(3) of the WPR acknowledges the President's pre-existing constitutional authority to use force in self-defense, defined in the provision as a response to "a national emergency" arising out of an "attack upon the United States." 50 U.S.C. § 1541(c). We would not, however, read section 2(c)(3) as limiting the President's right to direct the use of force in self-defense to cases of an actual armed attack because that reading would limit the President's authority to use force in anticipatory self-defense. *See infra* Part III.B.

### III. Authority Under International Law to Use Force Against Iraq

The United Nations Charter ("U.N. Charter") requires member states to refrain from the threat or use of force against the territorial integrity or political independence of any state, or in any other manner inconsistent with the purposes of the United Nations. U.N. Charter art. 2, ¶ 4. Nonetheless, the Security Council may act under chapter VII of the Charter to authorize member states to use such force "as may be necessary to maintain or restore international peace and security." *Id.* art. 42. In addition, article 51 of the U.N. Charter recognizes the "inherent right of individual or collective self-defense." Authority under international law for the use of force against Iraq stems from two different sources—Security Council authorization in the form of UNSCR 678, which authorizes the use of "all necessary means" to implement various UNSCRs relating to Iraq and to restore international peace and security, *id.* ¶ 2, and the inherent right of self-defense, recognized in article 51.[20] We will discuss each in turn.

### A. U.N. Security Council Authorization

On November 29, 1990, the Security Council, acting under chapter VII of the U.N. Charter, adopted UNSCR 678, which authorizes member states "to use all necessary means to uphold and implement resolution 660 (1990) and all subsequent relevant resolutions and to restore international peace and security in the area." *Id.* ¶ 2. Two such relevant resolutions are: (1) UNSCR 687, which established the conditions for a formal cease-fire suspending hostilities in the Persian Gulf;[21] and (2) UNSCR 688, which demanded that Iraq cease its repression of its civilian population because the consequences of that repression threatened international peace and security in the region. Fundamental to the restoration of international peace and security to the region is Iraq's compliance with the terms of both UNSCR 687, particularly its requirements that Iraq permanently dismantle its WMD program and permit U.N. inspections for verification purposes, and UNSCR 688. If UNSCR 678 is read together with UNSCRs 687 and 688, the Security Council has authorized the use of force against Iraq to uphold and implement the conditions of the cease-fire and to encourage Iraq to cease repres-

---

[20] While some in the international community might endorse the use of force against Iraq under the doctrine of humanitarian intervention, given Iraq's abhorrent treatment of its Kurdish population, the United States does not accept that doctrine as justifying the use of force, and there is significant doubt that it has achieved the status of a norm of customary international law. *See* Ralph Zacklin, Comment, *Beyond Kosovo: The United Nations and Humanitarian Intervention*, 41 Va. J. Int'l L. 923, 934-36 (2001); Jonathan I. Charney, Commentary, *Anticipatory Humanitarian Intervention in Kosovo*, 32 Vand. J. Transnat'l L. 1231, 1239-41 (1999).

[21] On April 6, 1991, Iraq responded to the conditions in UNSCR 687 in a letter to the Security Council stating that Iraq had "no choice but to accept this resolution." U.N. Doc. S/22456 (Apr. 6, 1991).

sion that threatens international peace and security in the region by, for example, contributing to refugee migration and cross-border incursions. To determine whether the existence of the cease-fire would prevent such a use of force, we turn to a consideration of the conditions under which the cease-fire may be suspended.

### 1. The Cease-Fire, Material Breach, and Treaty Law

No clearly established rule of international law exists regarding the appropriate circumstances in which a cease-fire established by a U.N. Security Council resolution may be suspended.[22] To discern an applicable standard, we look for guidance to general principles of treaty law.

UNSCR 687 explicitly establishes "a formal cease-fire . . . between Iraq and Kuwait and the [U.N.] Member States cooperating with Kuwait in accordance with resolution 678 (1990)." S.C. Res. 687, ¶ 33. UNSCR 687 is not a multilateral treaty, but for our purposes it may be useful to analogize it to such a treaty, as defined by the Vienna Convention on the Law of Treaties art. 60(2)(b), May 23, 1969, 1155 U.N.T.S. 331, 346 ("Vienna Convention"). Under the Vienna Convention, a "treaty" is a written international agreement between States that is governed by international law. *Id*. art. 2(1)(a). The State parties to the cease-fire agreement are Iraq, Kuwait, the United States, and the other members of the coalition in the Persian Gulf War. *Cf.* Ruth Wedgwood, Editorial Comment, *The Enforcement of Security Council Resolution 687: The Threat of Force Against Iraq's Weapons of Mass Destruction*, 92 Am. J. Int'l L. 724, 726 (1998) (pointing out that the original cease-fire on the ground was a decision of the individual members of the coalition, not the Security Council as a whole). Even if some of the State-parties to the cease-fire did not specifically agree to its terms because they were not members of the Security Council when Resolution 687 was adopted, the resolution is binding on them as members of the United Nations. *See* U.N. Charter art. 25 ("The Members of the United Nations agree to accept and carry out the decisions of the Security Council in accordance with the present Charter."); *Paris v. (1) Department of Nat'l Store Branch 1 (Vietnam)*, No. 99 Civ. 8607 (NRB), 2000 WL 777904, at *5 (S.D.N.Y. June 15, 2000) (under article 25, "all members of the United Nations are obliged to accept and carry out . . . decisions of the Security

---

[22] UNSCR 687 appears to be unprecedented in terms of the precision with which the Security Council established the parameters of the cease-fire. *Cf.* S.C. Res. 1199, U.N. Doc. S/RES/1199 (Sept. 23, 1998) (demanding that all parties in Kosovo immediately cease hostilities); S.C. Res. 338, U.N. Doc. S/RES/338 (Oct. 22, 1973) (calling upon all parties to the fighting in the Middle East to cease all firing and terminate all military activity immediately); S.C. Res. 27, U.N. Doc. S/RES/27 (Aug. 1, 1947) (calling on armed forces of the Netherlands and Indonesia to cease hostilities). The detailed conditions for the armistice suspending the hostilities in Korea, for example, are contained in an international agreement between the United Nations (represented by U.S. General Mark Clark, the Commander in Chief of the U.N. Command) and North Korea. *See* Military Armistice in Korea and Temporary Supplementary Agreement, July 27, 1953, 4 U.S.T. 234.

Council" acting under chapter VII); Memorandum for the President from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Proposed Executive Order Entitled "Transactions Involving Southern Rhodesia"* at 2 (Dec. 13, 1977) ("*Rhodesia Executive Order*") (United States is obligated under international law to implement a UNSCR adopted under chapter VII); *see also Case Concerning Questions of Interpretation and Application of the 1971 Montreal Convention Arising from the Aerial Incident at Lockerbie (Libyan Arab Jamahiriya v. U.S.)*, 1992 I.C.J. 114, 126, ¶ 42 (Apr. 14); *Legal Consequences for States of the Continued Presence of South Africa in Namibia (South West Africa) Notwithstanding Security Council Resolution 276 (1970)*, Advisory Opinion, 1971 I.C.J. 16, 53, ¶ 115 (June 21) ("*South Africa Advisory Opinion*").[23]

In the multilateral context, it is well established that a material breach of a treaty by one of the parties entitles a party "specially affected" by the breach to invoke it as a ground for suspending the operation of the treaty in whole or in part vis-à-vis the defaulting state. Vienna Convention art. 60(2)(b);[24] *see also* Memorandum for Alberto R. Gonzales, Counsel to the President, and William J. Haynes II, General Counsel, Department of Defense, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: Application of Treaties and Laws to al Qaeda and Taliban Detainees* at 23 (Jan. 22, 2002); Letter for John Bellinger, III, Senior Associate Counsel to the President and Legal Adviser to the National Security Council, from John C. Yoo, Deputy Assistant Attorney General, Office of Legal Counsel at 4 n.4 (Nov. 15, 2001); *International Load Line Convention*, 40 Op. Att'y Gen. 119, 124 (1941); 1 Restatement (Third) of the Foreign Relations Law of the United States § 335(2)(b) (1987). Even if the United States were not "specially affected" by Iraq's noncompliance with UNSCR 687, however, a material breach of a multilateral treaty also permits any non-defaulting party to cite the breach as a ground for complete or partial suspension with respect to itself "if the treaty is of such a character that a material breach of its provisions by one party radically changes the position of every party with respect to the further performance of its obligations under the treaty." Vienna Convention art. 60(2)(c); *see* 1 Restatement (Third) of the Foreign Relations Law of the United States § 335(2)(c) (1987). According to the Vienna Convention, a "material breach" includes "the violation of a provision essential to the accomplishment of the object

---

[23] We express no opinion here regarding whether suspending a Security Council resolution generally would be an appropriate remedy for its breach.

[24] Although not ratified by the United States, this convention "is frequently cited . . . as a statement of customary international law." *Review of Domestic and International Legal Implications of Implementing the Agreement with Iran*, 4A Op. O.L.C. 314, 321 (1981). Several lower courts have treated the convention as an authoritative codification of the customary international law of treaties. *See, e.g.*, *Chubb & Son, Inc. v. Asiana Airlines*, 214 F.3d 301, 308-09 (2d Cir. 2000), *cert. denied*, 533 U.S. 928 (2001); *Aquamar v. Del Monte Fresh Produce, Inc.*, 179 F.3d 1279, 1296 n.40 (11th Cir. 1999); *Kreimerman v. Casa Veerkamp*, 22 F.3d 634, 638 n.9 (5th Cir. 1994).

or purpose of the treaty." Vienna Convention, art. 60(3)(b);[25] *see also Black's Law Dictionary* 183 (7th ed. 1999) (defining "material breach" as "[a] substantial breach of contract, usu[ally] excusing the aggrieved party from further performance").

Regardless of whether a material breach must amount to non-compliance that "specially affects" the United States or that effects a "radical change" in circumstances, it seems clear that Iraq has sufficiently violated the cease-fire to meet either standard. Iraq's repeated refusals to comply with the international on-site inspections of its WMD program mandated by UNSCR 687 qualify as a material breach because they violate core provisions of the resolution. *See, e.g.*, S.C. Res. 687, ¶ 9 (Iraq shall "agree to urgent, on-site inspection" of its biological, chemical and missile capabilities); *id*. ¶ 12 (Iraq shall accept "urgent on-site inspection" of its nuclear materials and facilities). Iraq's continuing efforts to prevent the U.N. from inspecting potential WMD sites directly interferes with U.N. Security Council efforts to restore international peace and security in the region. Immediately after the ceasefire, for example, Iraq refused to cooperate with UNSCOM and the IAEA. On August 15, 1991, little more than three months after the adoption of UNSCR 687, the Security Council "condemn[ed]" Iraq's "serious violation" of a number of its obligations regarding the destruction and dismantlement of its WMD program and of its agreement to cooperate with UNSCOM and the IAEA, and stated that the violation "constitutes a material breach of the relevant provisions of [UNSCR 687] which established a cease-fire and provided the conditions essential to the restoration of peace and security in the region." S.C. Res. 707, ¶ 1. Over the next two years, the President of the Security Council issued six different statements reiterating that Iraq's refusal to cooperate with UNSCOM and the IAEA qualified as material breaches of UNSCR 687.[26]

---

[25] The International Law Commission of the United Nations explained its choice of the term "material" rather than the term "fundamental":

> The word "fundamental" might be understood as meaning that only the violation of a provision directly touching the central purposes of the treaty can ever justify the other party in terminating the treaty. But other provisions considered by a party to be essential to the effective execution of the treaty may have been very material in inducing it to enter into the treaty at all, even although these provisions may be of an ancillary character.

*Report of the Commission to the General Assembly*, [1963] 2 Y.B. Int'l L. Comm'n 187, 206, U.N. Doc. A/CN.4/SER.A./1963/ADD.1.

[26] *See* U.N. Doc. S/25970 (June 18, 1993) ("warn[ing] the Government of Iraq of the serious consequences of material breaches of resolution 687"); U.N. Doc. S/25091 (Jan. 11, 1993) (Iraq's prohibition on UNSCOM using its own aircraft to transport its personnel to Iraq constitutes "further material breach" of UNSCR 687); U.N. Doc. S/25081 (Jan. 8, 1993) (Iraq's prohibition on UNSCOM using its own aircraft throughout Iraq is an "unacceptable and material breach" of UNSCR 687); U.N. Doc. S/24240 (July 6, 1992) (Iraq's refusal to allow UNSCOM to enter certain premises constitutes a "material and unacceptable breach by Iraq of a provision of resolution 687"); U.N. Doc. S/23663 (Feb. 28, 1992) (Iraq's refusal to commence destruction of ballistic-missile related equipment is a "further

Further, in the years preceding the December 1998 missile strikes, Iraq continued to violate the WMD-related requirements in UNSCR 687. The Security Council adopted several resolutions condemning Iraq's noncompliance as "clear," "deeply disturbing," "unacceptable," "flagrant" and "a threat to international peace and security."[27] Although these denunciations by the Security Council do not use the particular phrase "material breach," the conduct criticized fits within the Vienna Convention's definition of that phrase: it violates conditions of the cease-fire that are essential to its purpose. Moreover, over the past few years, the absence of military force to compel Iraq's compliance with the terms of the cease-fire seems only to have increased its material breach. Since the 1998 airstrikes, Iraq has continued its flagrant violation of the terms of the cease-fire by refusing to permit *any* U.N. inspections of its WMD program. *See* S.C. Res. 1284 (noting Iraq's failure to implement fully UNSCR 687 and other relevant resolutions).

In sum, Iraq's repeated interference with international inspections of its WMD program qualifies as a "material breach" of the cease-fire under international law. In addition, were there to be evidence that Iraq is continuing to develop its WMD program, or has not destroyed its WMD and their means of delivery, such actions also would constitute material breaches of Iraq's obligations under UNSCR 687 unconditionally to destroy, and cease to develop, WMD and their delivery systems.

---

material breach" of UNSCR 687); U.N. Doc. S/23609 (Feb. 19, 1992) (Iraq's failure to acknowledge its obligations under UNSCR 707 and 715, its rejection of UNSCOM's and the IAEA's plans for monitoring and verification, and its failure to provide adequate disclosure of its weapons capabilities constitute a "continuing material breach" of UNSCR 687).

[27] *See, e.g.*, S.C. Res. 1060, ¶ 1, U.N. Doc. S/RES/1060 (Jun. 12, 1996) (calling Iraq's refusal to allow access to UNSCOM "a clear violation" of UNSCR 687); S.C. Res. 1115, ¶ 1, U.N. Doc. S/RES/1115 (June 21, 1997) (condemning Iraq's refusal to allow access to UNSCOM as "a clear and flagrant violation of the provisions of" UNSCR 687); S.C. Res. 1134, ¶¶ 1-2, U.N. Doc. S/RES/1134 (Oct. 23, 1997) (deciding that Iraq's refusal to allow access to UNSCOM, and especially Iraqi actions endangering the security of UNSCOM personnel, its destruction of documents, and its interference with the freedom of movement of UNSCOM personnel, were a "flagrant violation" of UNSCR 687); S.C. Res. 1137, pmbl. ¶ 11 (determining that Iraq's obstructionism with respect to UNSCOM "continues to constitute a threat to international peace and security"); S.C. Res. 1194, ¶ 1, U.N. Doc. S/RES/1194 (Sept. 9, 1998) (Iraq's decision to suspend cooperation with UNSCOM "constitutes a totally unacceptable contravention of its obligations" under UNSCR 687); S.C. Res. 1205, ¶ 1 (condemning Iraq's decision to end cooperation with UNSCOM as a "flagrant violation" of UNSCR 687); *see also* Statement by the President of the Security Council, U.N. Doc. S/PRST/1997/56 (Dec. 22, 1997) ("The Security Council stresses that failure by the Government of Iraq to provide [UNSCOM] with immediate, unconditional access to any site or category of sites is unacceptable and a clear violation of the relevant resolutions."); Press Statement by the Security Council (Oct. 31, 1998) (referring to Iraq's decision to halt cooperation with UNSCOM and its restrictions on the IAEA's work as "deeply disturbing").

## 2. Remedies

Having determined that the President has sufficient grounds to find Iraq in material breach of the cease-fire, we must address whether unilaterally suspending the cease-fire constitutes a proper remedy for the violation. We believe that Iraq's material breaches of the cease-fire entitle the United States, as a party to the cease-fire, unilaterally to suspend its operation.[28] *Cf.* Memorandum for John Bellinger, III, Senior Associate Counsel to the President and Legal Adviser to the National Security Council, from John C. Yoo, Deputy Assistant Attorney General, and Robert J. Delahunty, Special Counsel, Office of Legal Counsel, *Re: Authority of the President to Suspend Certain Provisions of the ABM Treaty* at 20-21 (Nov. 15, 2001) ("*Authority to Suspend ABM Treaty*") (In *Charlton v. Kelly*, 229 U.S. 447, 473 (1913), the Supreme Court held that "if a partner to a treaty commits a material breach, the President has the option whether to void the treaty or to overlook the breach and regard the treaty merely as voidable."). Under accepted principles of international treaty law, the United States need not obtain the concurrence of the other parties to the cease-fire prior to suspending its terms. *See* Wedgwood, *Enforcement of Security Council Resolution 687*, 92 Am. J. Int'l L. at 726 (United States did not need to wait for Security Council approval before responding to a breach of the cease-fire because "[i]t is not unreasonable to regard the terms of such a cease-fire [UNSCR 687] as self-executing, just as the violation of a newly settled boundary line or demilitarized zone would entitle a neighboring state to act upon a violation"); *cf.* Vienna Convention art. 60 (no requirement that all parties to a multilateral treaty agree to suspend the treaty—one party may suspend the treaty with respect to itself).

Some commentators have argued that, before the cease-fire may be suspended, the United States must first obtain a new UNSCR finding that Iraq is in material breach of its obligations. The circumstances that gave rise to the Security Council's finding in UNSCR 707 that Iraq's noncompliance with the terms of the cease-fire constituted a material breach are still present today—Iraq continues its significant obstruction of international inspections of its WMD program. More-

---

[28] We note that, outside the particular parameters of the Iraq context, where Security Council Resolutions both establish a cease-fire between specific parties and authorize the use of force, violations of Security Council resolutions generally lead to challenges before the International Court of Justice, *see, e.g.*, *South Africa Advisory Opinion*, and/or diplomatic repercussions, *see Rhodesia Executive Order* at 6 (noting "considerable embarrassment" suffered by the United States when it violated its obligation under the U.N. Charter to implement a Security Council resolution due to a later legislative enactment that took precedence over the resolution); *cf.* Memorandum for John Bellinger, III, Senior Associate Counsel to the President and Legal Adviser to the National Security Council, from John C. Yoo, Deputy Assistant Attorney General, and Robert J. Delahunty, Special Counsel, Office of Legal Counsel, *Re: Authority of the President to Suspend Certain Provisions of the ABM Treaty* at 12-13 & n.13 (Nov. 15, 2001) (discussing possible international sanctions the United States may face if it breaches its treaty or other international law obligations).

over, we believe that it is within the power of the United States to ascertain for itself whether, as an objective fact, there has been a material breach of an agreement to which it is a party. *See Legal Authority for the Possible Use of Force Against Iraq*, 92 Am. Soc'y Int'l L. Proc. 136, 141 (1998) ("Whether there [is] a material breach is an objective fact. It is not necessary that it be the [Security] Council that determines or states that a material breach has occurred.") (statement of Michael Matheson, Principal Deputy Legal Adviser, Department of State); *see also* Michael L. Cornell, Comment, *A Decade of Failure: The Legality and Efficacy of United Nations Actions in the Elimination of Iraqi Weapons of Mass Destruction*, 16 Conn. J. Int'l L. 325, 356 (2001) ("nothing in UNSCR 687, the U.N. Charter, or international law . . . requires a finding of material breach to be documented by the UNSC"); *cf.* Wedgwood, *Enforcement of Security Council Resolution 687*, 92 Am. J. Int'l L. at 728 n.26 (definition of material breach is objective). For example, the United States launched the 1998 airstrikes without first obtaining either a Security Council resolution or a statement by the President of the Security Council that Iraq had materially breached its international obligations.

Thus, in response to Iraq's material breaches of the conditions of the cease-fire established in UNSCR 687, the United States may suspend the cease-fire, which otherwise obligates the United States, Iraq, Kuwait, and the other members of the coalition in the Persian Gulf War to refrain from military action. Once the cease-fire is suspended, the United States may again rely on the authorization in UNSCR 678 to use force against Iraq to implement UNSCR 687 and to restore international peace and security to the area. *See* Wedgwood, *Enforcement of Security Council Resolution 687*, 92 Am. J. Int'l L. at 726 (Iraq's breach of the terms of the cease-fire in 1997-1998 "allowed the United States to deem the cease-fire in suspension and to resume military operations to enforce its conditions"); *cf.* Joseph Murphy, *De Jure War in the Gulf: Lex Specialis of Chapter VII Actions Prior to, During, and in the Aftermath of the United Nations War Against Iraq*, 5 N.Y. Int'l L. Rev. 71, 84-85 (1992) (continuing material breach of UNSCR 687 by Iraq would effectively nullify the permanent cease-fire and would reinstate UNSCR 678 and its authorization to use military force to implement all subsequent relevant resolutions, including UNSCR 687). In our view, UNSCR 678's authorization to use force has continued in effect since it was first adopted in 1990. We disagree with the idea that, due to the cease-fire established in UNSCR 687, UNSCR 678's authorization has expired. The consistent position of the United States has been that UNSCR 678 survived the cease-fire. *See, e.g.*, Letter to Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 2 *Pub. Papers of Pres. George Bush* 1164, 1164-65 (Sept. 16, 1991) (explaining—after the adoption of UNSCR 687—that the United States was willing to take military action to implement UNSCR 678's call for the restoration of international peace and security to the region); *Legal Authority for the Possible*

*Use of Force Against Iraq*, 92 Am. Soc'y Int'l L. Proc. at 142 ("In the U.S. Government's view, there is a continuing right to use force [to respond] to such [material] breaches regardless of whether there is further [Security Council] authorization to respond.") (panelist Michael Matheson, Principal Deputy Legal Adviser, Department of State). As discussed earlier, *see supra* notes 2, 9-10, and accompanying text, UNSCR 678 has been explicitly reaffirmed by UNSCR 687 itself, as well as by UNSCRs 686 and 949.[29] And, as we explain below, *see infra* Part III.A.4, general principles of armistice law confirm that the cease-fire did not extinguish the Security Council's authorization to use force, but rather suspended hostilities between Iraq, the United States, and other members of the coalition.

In our view, the President could reasonably determine that suspending the cease-fire and resuming hostilities with Iraq is an appropriate response to Iraq's material breaches of the cease-fire. Over the years, Iraq repeatedly has refused to respond to diplomatic overtures and other non-military attempts to force Iraq to comply with its obligations to permit full U.N. inspections of its WMD program. The President could reasonably conclude that military force is necessary to obtain Iraqi compliance with the terms of the cease-fire, thereby restoring international peace and security to the region. And, as we will explain below, state practice confirms that the suspension of the cease-fire and the subsequent use of military force against Iraq constitute an appropriate remedy for Iraq's material breaches of the cease-fire, provided that such use of force is necessary and proportional.

### 3. State Practice on Suspension in Response to Material Breach

Suspension of treaties or international agreements in response to a material breach is a well-established practice in which the United States has engaged on several occasions. Such state practice is relevant as a demonstration of customary international law. *See* 1 Restatement (Third) of the Foreign Relations Law of the United States § 102(2) (1987) (customary international law stems from "a general and consistent practice of states followed by them from a sense of legal obligation"); *id*. § 103 cmt. a (best evidence of customary international law is proof of state practice, ordinarily provided by official documents and other indications of governmental action).

The United States has repeatedly suspended the cease-fire established by UNSCR 687 in response to Iraq's material breach of that resolution. The United States and Britain, for example, used force against Iraq in 1993 and 1998 in response to Iraq's material breach of UNSCR 687. On January 17, 1993, President

---

[29] The United Nations Secretary General himself endorsed the concept that UNSCR 678 survived the cease-fire when he declared that the January 1993 strikes against Iraq, which were undertaken pursuant to UNSCR 678, were in accordance with the U.N. Charter. *See* Letter to Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 2 *Pub. Papers of Pres. George Bush* 2269, 2269 (Jan. 19, 1993).

George H.W. Bush ordered missile strikes against a nuclear facility near Baghdad due to both Iraq's refusal to permit certain U.N. aircraft to land in that city, and a series of incidents in which Iraq challenged the authority of the U.N. Iraq-Kuwait Observation Mission along the Iraq-Kuwait border. The Security Council found each of these actions by Iraq to be material breaches of the cease-fire. In addition, the United States was responding to UNSCOM's findings on January 15 and 16 that Iraq had abdicated its responsibilities to safeguard UNSCOM personnel and was unacceptably attempting to restrict the Commission's freedom of movement. *See* Letter to Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 2 *Pub. Papers of Pres. George Bush* 2269, 2269-70 (Jan. 19, 1993). The strikes were designed "to help achieve the goals of U.N. Security Council Resolutions 687, 707, and 715," which required Iraq to accept the inspection and dismantlement of its WMD program. *Id.* at 2270.

Just four days prior to the January 17th strikes, President Bush ordered an air attack on surface-to-missile sites and related facilities in the southern no-fly zone. The January 13th attack, which was joined by Britain and France, appears to have been primarily in response to Iraqi violations of the southern no-fly zone—Iraq had moved surface-to-air missiles into the zone to threaten coalition aircraft, but President Bush also pointed to Iraq's "'failure to live up to the resolutions.'" Barton Gellman & Ann Devroy, *U.S. Delivers Limited Air Strike on Iraq; Bush Sends Battalion to Kuwait; Baghdad Appears to Make Concessions*, Wash. Post, Jan. 14, 1993, at A1, A18 (quoting President Bush); *see also* Press Release, United States Mission to the United Nations, USUN-1 (Jan. 13, 1993) ("[T]he Government of Iraq should understand that continued defiance of U.N. Security Council resolutions and related coalition demarches will not be tolerated.") (statement by Marlin Fitzwater). The President's report to Congress on the attack takes note of a statement by the U.N. Secretary General explaining that "'the forces that carried out the [January 13th] raid[] have received a mandate from the Security Council, according to Resolution 687, and the cause of the raid was the violation by Iraq of Resolution 687 concerning the cease-fire. . . . [T]his action . . . conformed to the Charter of the United Nations.'" Letter to Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 2 *Pub. Papers of Pres. George Bush* 2269, 2269 (Jan. 19, 1993) (quoting U.N. Secretary General Boutros-Ghali).

In December 1998, President Clinton explained that the United States launched seventy hours of missile and aircraft strikes against Iraq "in response to Iraqi breaches of its obligations under resolutions of the United Nations Security Council." *See* Letter to Congressional Leaders on the Military Strikes Against Iraq, 2 *Pub. Papers of Pres. William J. Clinton* 2195, 2195 (Dec. 18, 1998). President Clinton's justification for the military action, which targeted facilities actively involved in Iraq's WMD programs or that threatened Iraq's neighbors or U.S. forces, was that

> [i]t is consistent with and has been taken in support of numerous U.N. Security Council resolutions, including Resolutions 678 and 687, which authorize U.N. Member States to use "all necessary means" to implement the Security Council resolutions and to restore peace and security in the region and establish the terms of the cease-fire mandated by the Council, including those related to the destruction of Iraq's WMD programs.

*Id*. at 2195-96. As the Acting U.S. Ambassador to the United Nations A. Peter Burleigh explained to the other members of the Security Council, Iraq had acted in "flagrant material breach of resolution 687" by interfering with UNSCOM's inspections, and coalition forces responded under the authority provided by UNSCRs. *See* Press Release, Security Council, Security Council Meets to Discuss Military Strikes Against Iraq; Some Members Challenge Use of Force Without Council Consent, U.N. Press Release SC/6611, at 1-2, 7 (Dec. 16, 1998). Professor Ruth Wedgwood agrees:

> Iraq's calculated defiance of [the terms of the cease-fire regarding elimination of WMD and verification by UNSCOM] in the 1997-1998 confrontation allowed the United States to deem the cease-fire in suspension and to resume military operations to enforce its conditions, subject to the requirements of necessity and proportionality. . . . The right to use force unilaterally to vindicate the inspection regime is also ratified by . . . the events of January 1993 [in which] Iraq was warned [by the Security Council] that "serious consequences" would flow from "continued defiance." On January 13, 1993, the United Kingdom and France joined the United States in conducting air raids on sites in southern Iraq.

Wedgwood, *Enforcement of Security Council Resolution 687*, 92 Am. J. Int'l L. at 726-27. International support for the 1998 airstrikes is reflected by the offer of Argentina, Australia, Canada, the Czech Republic, Denmark, Germany, Hungary, the Netherlands, New Zealand, Portugal, Spain and the United Kingdom to contribute facilities, equipment or forces to the U.S. military effort, and of Kuwait for the use of its air facilities. *See id*. at 727.[30]

---

[30] It bears mention, however, that the reaction of the international community to the use of force against Iraq in 1998 was not wholly supportive. Although Britain and Japan spoke in favor of the strikes, the Russian Federation labeled them as "violat[ing] the principles of international law and the principle of the [U.N.] Charter." U.N. Press Release SC/6611, at 4. Of the Security Council members at the time, China, Costa Rica, Sweden, Brazil, Gambia, Kenya and Gabon also spoke against the 1998 strikes—some preferring the peaceful settlement of disputes and some criticizing the unilateral use of force. *Id*. at 5-10.

The United States engaged in the practice of suspending treaties or international agreements in response to a material breach long before the conflict with Iraq. For example, on June 20, 1876, President Grant informed Congress that he was suspending the extradition clause of the 1842 Webster-Ashburton Treaty with Britain, U.S.-Gr. Brit., art. X, Aug. 9, 1842, 8 Stat. 572, 576. In President Grant's view, the release of two fugitives by Britain whose extradition was sought by the United States was "an abrogation and annulment" of the extradition clause of the treaty, and in response the United States refused to surrender fugitives sought by the British Government until the British resumed performance. *Authority to Suspend ABM Treaty* at 17-18; Jacques Semmelman, *The Doctrine of Specialty in the Federal Courts: Making Sense of United States v. Rauscher*, 34 Va. J. Int'l L. 71, 125-30 (1993).

More recently, in 1973, the United States charged the Democratic Republic of Vietnam with serious violations of the recently-concluded Agreement on Ending the War and Restoring Peace in Viet-nam, Jan. 27, 1973, 24 U.S.T. 1. In response, the United States declared that it would suspend its mine-clearing operations, which were mandated by the Agreement. *See* Arthur W. Rovine, *Digest of United States Practice in International Law* 482 (1973). The United States explained: "This suspension is justified as a response to the numerous material breaches of the Agreement by the Democratic Republic of Viet-Nam in accordance with the rule of international law as set forth in Article 60 of the 1969 [Vienna] Convention on the Law of Treaties." *Id.*

The United States also partially suspended a multilateral treaty due to a material breach by one of the other parties in August 1986. In response to a policy adopted by New Zealand under which U.S. vessels and aircraft could not enter New Zealand ports unless they declared that they were not nuclear-armed or nuclear-powered, the United States suspended its security obligations under the ANZUS Pact—the Security Treaty Between Australia, New Zealand, and the United States, Sept. 1, 1951, 3 U.S.T. 3420—as to New Zealand but not to Australia. *See* 1 Marian Nash (Leich), *Cumulative Digest of United States Practice in International Law*, *1981-1988*, at 1279-81. The United States explained that "[a]ccess for allied ships and aircraft . . . is essential to the effectiveness of the ANZUS alliance. . . . Because of New Zealand's decision to renege on an essential element of its ANZUS participation, it has become impossible for the United States to sustain its security obligations to New Zealand." Statement of Secretary of State George Shultz, *in U.S. and Australia Hold Ministerial Talks*, 86 Dep't St. Bull. 43, 44 (Oct. 1986). The United States determined that New Zealand had committed a material breach of article 2 of the ANZUS Pact, which states that the parties, "by means of continuous and effective . . . mutual aid will maintain and develop their individual and collective capacity to resist armed attack." 3 U.S.T. 3422; *see* Joint Statement by Secretary of State George Shultz, Secretary of Defense Caspar Weinberger, Australian Minister for Foreign Affairs Bill Hayden,

and Australian Minister for Defense Kim Beazley, *in U.S. and Australia Hold Ministerial Talks*, 86 Dep't St. Bull. at 48 (agreeing that access for allied ships and aircraft is essential to the effectiveness of the ANZUS alliance and that New Zealand's policies were detracting from the individual and collective capacity to resist armed attack); *see generally Authority to Suspend ABM Treaty* at 18.

In sum, for more than a century, the United States has engaged in the well-established practice under international law of suspending treaties in response to a material breach by one of the other parties to the treaty. The United States has extended this practice to the conflict with Iraq, viewing material breaches by Iraq of the UNSCR that established the cease-fire as justification for the suspension of that cease-fire. The United States has then proceeded to use force as authorized by the Security Council in UNSCR 678.

### 4. Armistice Law

Using force in response to a material breach of the cease-fire also would be consistent with general principles of armistice law. The cease-fire established by UNSCR 687 is similar to an armistice—unlike a peace treaty, it does not terminate the state of war, but merely "suspends military operations by mutual agreement between the belligerent parties." Hague Convention on the Law and Customs of War on Land, Oct. 18, 1907 ("Hague Convention IV"), Annex ("Hague Regulations") art. 36, 36 Stat. 2277, 2305;[31] *see also Ludecke v. Watkins*, 335 U.S. 160, 167 (1948); *Commercial Cable Co. v. Burleson*, 255 F. 99, 104-05 (S.D.N.Y. 1919) (L. Hand, J.), *rev'd and vacated as moot*, *Kansas v. Burleson*, 250 U.S. 188 (1919) ("An armistice effects nothing but a suspension of hostilities; the war still continues."); Yoram Dinstein, *War, Aggression and Self-Defence* 50 (3d ed. 2001) ("A labelling of Resolution 687 as a 'permanent cease-fire' is a contradiction in terms: a cease-fire, by definition, is a transition-period arrangement."); *cf. In re Yamashita*, 327 U.S. 1, 11-12 (1946) (a state of war exists from the time war is declared until peace is proclaimed); *Ribas y Hijo v. United States*, 194 U.S. 315, 323 (1904) ("A truce . . . does not terminate the war. . . . At the expiration of the truce, hostilities may recommence without any fresh declaration of war.") (internal quotations omitted); *Termination of Wartime Legislation*, 40 Op. Att'y Gen. 421, 422 (1945) (statutes effective only "in time of war" remain effective until restoration of a formal state of peace); Sydney D. Bailey, *Cease-Fires, Truces, and Armistices in the Practice of the UN Security Council*, 71 Am. J. Int'l L. 461, 463, 469-71 (1977) (whereas an armistice is negotiated directly between the belligerents, the Security Council has introduced a new concept—the cease fire—that "is

---

[31] The Nuremberg Tribunal recognized the Hague Regulations as articulating customary international law. *See* Trial of the Major War Criminals Before the International Military Tribunal (1945-1946), *reprinted in* II *The Law of War: A Documentary History* 922, 960-61 (Leon Friedman, ed., 1972).

simply a suspension of acts of violence . . . resulting from the intervention of a third party"). Thus, the cease-fire established in UNSCR 687 merely suspended, rather than terminated, hostilities with Iraq.

A cease-fire allows a party to a conflict to resume hostilities under certain conditions. Under the Hague Regulations, "[a]ny serious violation of the armistice by one of the parties gives the other party the right of denouncing it, and even, in cases of urgency, of recommencing hostilities immediately." Hague Regulations art. 40, 36 Stat. at 2305-06; *see also* U.S. Army Field Manual, *The Law of Land Warfare*, FM 27-10, ch. 7, ¶ 493 (July 1956, as updated) (hostilities may be resumed only with "convincing proof of intentional and serious violation of [the armistice's] terms by the other party").[32] The Hague Regulations do not contain any explanation of what might qualify as "urgency," but the Department of the Army's Field Manual sheds some light on the question. According to the Army Field Manual, warning must be given to the other side, unless "the delay incident to formal denunciation and warning seems likely to give the violator a substantial advantage of any kind." FM 27-10, ch. 7, ¶ 493; *cf.* 2 L. Oppenheim, *International Law: Disputes, War, and Neutrality* 556 (H. Lauterpacht ed., 7th ed. 1952) ("since the terms 'serious violation' and 'urgency' lack precise definition, the course to be taken is in practice left to the discretion of the injured party").[33]

The missile strikes in 1993 and 1998 serve as clear examples of the suspension of a cease-fire and a resumption of hostilities due to serious violations by Iraq. As one scholar has described, "[t]he [1998-1999] air campaign must be seen as a resumption of combat operations in the face of Iraqi violations of the cease-fire terms. The hostilities merely continue a decade-long war, which started when Iraq invaded Kuwait in August 1990." Dinstein, *War, Aggression and Self-Defense* at 50-51. Whether or not required under international law, warnings were given. *See*

---

[32] The provisions in the Hague Regulations relating to a violation of an armistice were a compromise between those who believed that under international law the injured party may recommence hostilities immediately without notice, and those who thought that the only right of the injured party is the right to "denounce" the armistice. *See* 2 L. Oppenheim, *International Law: Disputes, War, and Neutrality* 555-56 (H. Lauterpacht ed., 7th ed. 1952).

[33] In addition to permitting the resumption of hostilities in response to a serious violation of an armistice, the laws of armed conflict permit the United States to resume hostilities at its discretion—provided that warning is given to Iraq. According to the Hague Regulations, if an armistice does not specify its duration, "the belligerent parties may resume operations at any time, provided always that the enemy is warned within the time agreed upon, in accordance with the terms of the armistice." Hague Regulations art. 36, 36 Stat. at 2305. If the parties have not made any stipulation regarding notice, it may be provided at any time, and hostilities may recommence immediately after notification. *See* U.S. Army Field Manual, *The Law of Land Warfare*, FM 27-10, ch. 7, ¶ 487 (July 1956, as updated); 2 Oppenheim, *Disputes, War and Neutrality* at 556; *see also* Colonel Howard S. Levie, *The Nature and Scope of the Armistice Agreement*, 50 Am. J. Int'l L. 880, 893 (1956) (although armistices generally do not specify the period of advance notice required, under customary international law, "good faith requires that notice be given of the intention to resume hostilities") (internal quotations and citations omitted).

*generally* Note by the President of the Security Council, U.N. Doc. S/25091 (Jan. 11, 1993) (warning Iraq of the "serious consequences" that would follow if it failed to comply with its obligations); Note by the President of the Security Council, U.N. Doc. S/25081 (Jan. 8, 1993) (same); Letter to Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 2 *Pub. Papers of Pres. George Bush* 2269, 2269-70 (Jan. 19, 1993) (noting Security Council's warnings prior to the January 17th attack and explaining that the United States and the coalition warned Iraq prior to the January 13th strikes); The President's Radio Address, 2 *Pub. Papers of Pres. William J. Clinton* 2197, 2197 (Dec. 19, 1998) ("Last month, when [Saddam Hussein] agreed to fully cooperate, I canceled an American military action. But I . . . made it absolutely clear that if he did not fully cooperate, we would have no choice but to act without further negotiation or warning."). It is our understanding based on information supplied by the Department of Defense that in neither case did the United States obtain the express agreement of all of the other members of the Persian Gulf War coalition before suspending the cease-fire and using force.

Under general principles of armistice law, therefore, because the initial use of force in response to the invasion of Kuwait—Operation Desert Storm—was authorized under UNSCR 678, subsequent uses of force against Iraq in response to serious violations of the terms of the cease-fire established by UNSCR 687 would be authorized as well, provided either that Iraq has been warned, or that such a warning may be avoided because it would be likely to give Saddam Hussein a substantial advantage.

If Iraq is currently in "serious violation" of the cease-fire, the United States may respond with force. It is our understanding that Iraq continues to violate, in particular, the conditions set forth in section C of UNSCR 687. As outlined above, *supra* Part I, that section requires Iraq to (1) accept unconditionally the destruction, removal, or rendering harmless, under international supervision, of its chemical and biological weapons and its ballistic missiles with a range greater than 150 kilometers (and related major parts, and repair and production facilities) and agree to urgent on-site inspection of such weapons and their delivery systems; (2) undertake unconditionally not to use, develop, construct or acquire such WMD and their delivery systems; (3) agree unconditionally not to acquire or develop nuclear weapons or nuclear-weapons-usable material or any subsystems or components or any related research, development, support or manufacturing facilities; and (4) accept on-site inspection and the destruction, removal or rendering harmless as appropriate of all such nuclear-related weapons or materials. Iraq must comply with all four conditions to be in compliance with the terms of the cease-fire, and the President could determine that violation of any one of these conditions constitutes a serious violation of the cease-fire. Even if Iraq were to accept the return of U.N. inspectors and grant them unimpeded access, if Iraq has not destroyed its WMD and their delivery systems, or continues to seek to build

175

such weapons, the United States may still respond with force because Iraq would be in "serious violation" of the cease-fire agreement.

### 5. UNSCR 688

Apart from material breach and armistice law, the use of force against Iraq also may be justified in certain circumstances in response to threats to international peace and security caused by Iraq's violation of UNSCR 688. UNSCR 678 authorizes the use of "all necessary means" not only to eject Iraq from Kuwait, but also to uphold and implement "subsequent relevant resolutions" and to restore international peace and security to the Persian Gulf region. UNSCR 688 condemned Iraq's repression of its civilian population, found that such repression endangered international peace and security in the region, and demanded that Iraq cease such repression. By its terms, UNSCR 688 qualifies as a "subsequent relevant resolution" and its effective implementation is necessary to the restoration of peace and security to the region. Thus, UNSCR 688, in combination with UNSCR 678, provides authorization from the U.N. Security Council to use force, if necessary, to stop Iraq from repressing its civilian population if such repression would threaten international peace and security by, for example, causing refugee flows that would destabilize the region.

The Clinton Administration focused on this combination of UNSCRs 678 and 688 to justify its September 1996 airstrikes and the subsequent expansion of the southern no-fly zone. When Saddam Hussein moved against the Kurdish civilian population in northern Iraq in 1996, the Administration stated that he violated UNSCR 688 and thereby threatened international peace and security by increasing the risk of cross-border incursions by neighboring countries or large flows of refugees across international borders. In response, the United States relied on UNSCR 678 to bring Iraq into compliance with UNSCR 688 and to restore international peace and security.[34] *See generally* Gingrich Letter at 1 ("Our response demonstrates to Saddam Hussein that he must cease all actions that threaten international peace and security."); *id*. at 2 ("The no-fly zones were originally established pursuant to and in support of [UNSCRs] 678, 687, and 688 . . . . Expanding the no-fly zone was a reasonable response to the enhanced threat posed by Iraq."); Glyn Davies, U.S. Dep't of State, Daily Press Briefing at 3 (Sept. 4, 1996), *available at* http://dosfan.lib.uic.edu/ERC/briefing/daily_briefings/ 1996/9609/960904db.html (last visited June 4, 2012) ("678 and 688 together, I think, form the basis for the action we took"); Nicholas Burns, U.S. Dep't of State,

---

[34] The September 1996 strikes met with a mixed response from other members of the Security Council—while Britain, Germany, Canada and Japan offered general support for the U.S. and U.K. military action, Russia denounced it and France and Spain stated that the United States should have sought a political solution. *See* Alain E. Boileau, *To the Suburbs of Baghdad: Clinton's Extension of the Southern Iraqi No-Fly Zone*, 3 ILSA J. Int'l L. & Comp. L. 875, 890-91 (1997).

Daily Press Briefing at 13-14 (Sept. 3, 1996), *available at* http://dosfan.lib.uic.edu/ ERC/briefing/daily_briefings/1996/9609/960903db.html (last visited June 4, 2012) ("There was no need for Security Council action. The United States has clear authority under U.N. Security Council Resolution 688."); *cf.* Letter to Congressional Leaders on the Situation in the Persian Gulf, 1 *Pub. Papers of Pres. George Bush* 521, 521-22 (May 17, 1991) (explaining that introduction of U.S. forces into northern Iraq for emergency relief purposes was "consistent with" UNSCR 688, but not an attempt to intervene militarily into Iraq's internal affairs or to impair its territorial integrity).[35]

In sum, we believe that the Security Council has authorized the United States to resort to the use of force against Iraq either (1) in response to Iraq's material breaches or substantial violations of the terms of the cease-fire, which permit the United States to suspend the cease fire and rely on UNSCR 678 as an authorization to use "all necessary means" to bring Iraq into compliance with UNSCR 687, or (2) in response to violations of UNSCR 688 that threaten international peace and security.[36]

## B. Anticipatory Self-Defense

Independent of the support provided by U.N. Security Council resolutions, authority under international law for armed intervention in Iraq could come from the national right of self-defense. The right of self-defense under customary

---

[35] The international authorization for the 1996 strikes is similar to the justification for establishing and patrolling the no-fly zones in the north and south of Iraq. Although the U.N. has not officially endorsed the creation of the no-fly zones, *see* Ian Johnstone, *Aftermath of the Gulf War: An Assessment of UN Action* 38 (1994), the zones are authorized under a combination of resolutions 678 and 688 to monitor compliance with resolution 688 and to deter repression of the civilian population, as well as under a combination of resolutions 678 and 687 to implement the cease-fire by monitoring Iraq's compliance with its terms. *See* James P. Rubin, U.S. Dep't of State, Daily Press Briefing at 5 (Jan. 5, 1999), *available at* http://www.fas.org/news/iraq/1999/01/990105db.html (last visited June 4, 2012) (zones are authorized by a combination of UNSCRs 678, 687—which reaffirmed 678—and 688); *see also* Letter to Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 1 *Pub. Papers of Pres. William J. Clinton* 715, 716 (May 21, 1993) (no-fly zones monitor Iraqi compliance with UNSCR 688 and UNSCR 687); Letter to Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 2 *Pub. Papers of Pres. George Bush* 2269, 2269-70 (Jan. 19, 1993) (southern no-fly zone monitors Iraqi compliance with UNSCR 688).

[36] We believe that UNSCR 678's authorization of "all necessary means . . . to restore international peace and security in the area" (S.C. Res. 678, ¶ 2) arguably would independently authorize the President to use force, even if Iraq had not engaged in violations of UNSCRs 687 or 688. Determining whether the use of force would be necessary to restore international peace and security would be wholly within the President's discretion. We need not decide this issue here, however, because, as the President recently explained to the United Nations, Iraq has engaged in repeated violations of both UNSCR 687 and UNSCR 688. *See* Address to the United Nations General Assembly in New York City, 2 *Pub. Papers of Pres. George W. Bush* 1572, 1573 (Sept. 12, 2002).

international law is well established. Article 51 of the U.N. Charter recognizes and affirms that "inherent" right:

> Nothing in the present Charter shall impair the inherent right of individual or collective self-defence if an armed attack occurs against a Member of the United Nations, until the Security Council has taken measures necessary to maintain international peace and security.

*See also* North Atlantic Treaty art. 5, Apr. 4, 1949, 63 Stat. 2241, 2244, 34 U.N.T.S. 243, 246 (agreeing that if an armed attack occurs against one of the parties, the others will exercise the right of individual or collective self-defense recognized by article 51); Inter-American Treaty of Reciprocal Assistance and Final Act of the Inter-American Conference for the Maintenance of Continental Peace and Security art. 3, Sept. 2, 1947, 21 U.N.T.S. 77, 95 (Rio Treaty) (same). Although recognized by these agreements, the right to self-defense is broader in scope than suggested by these provisions. For example, in July 1940, the British used force in self-defense against the French, absent any armed attack by the French and even though Britain and France had recently been fighting Hitler side-by-side. Shortly after the Vichy regime was established in June 1940, the British gave the French an ultimatum requiring the French to take certain steps to protect their ships at Mers-el-Kabir—a small base on the Algerian coast—from being taken over by the Germans. When the French refused to comply, the British opened fire under "Operation Catapult," killing more than 1,200 French officers and men. *See generally* Alistair Horne, *Mers-el-Kebir Was a Bizarre and Melancholy Action*, 16 Smithsonian 122 (July 1985); W.T. Mallison, Jr., *Limited Naval Blockade or Quarantine-Interdiction: National and Collective Defense Claims Valid Under International Law*, 31 Geo. Wash. L. Rev. 335, 349 (1962). Prime Minister Winston Churchill took this action believing that "the life of the State and the salvation of our cause were at stake. . . . [N]o act was ever more necessary for the life of Britain and for all that depended upon it." Winston S. Churchill, *The Second World War: Their Finest Hour* 232 (1949); *see also* Memorandum for William J. Haynes II, General Counsel, Department of Defense, from Jay S. Bybee, Assistant Attorney General, Office of Legal Counsel, *Re: Legal Constraints to Boarding and Searching Foreign Vessels on the High Seas* at 5 (June 13, 2002) ("*Boarding and Searching Foreign Vessels*") (discussing 1939 blockade on the high seas adjacent to the American continent to prevent any belligerent nation from taking hostile action in these waters as an example of anticipatory self-defense).

Despite the longstanding recognition of a nation's right to self-defense, some argue that article 51 has limited the right to permit only a response to an actual "armed attack." *See, e.g.*, Dinstein, *War, Aggression and Self-Defense* at 167-68. Some even argue that an armed attack must occur across national borders before

the article 51 right is triggered. *See, e.g.*, Ian Brownlie, *International Law and the Use of Force by States* 275-80 (1963). Such an interpretation, however, would mean that the U.N. Charter extinguished the pre-existing right under customary international law to take reasonable anticipatory action in self-defense. There is no indication that the drafters of the U.N. Charter intended to limit the customary law in this way. *See* Myres S. McDougal, Editorial Comment, *The Soviet-Cuban Quarantine and Self-Defense*, 57 Am. J. Int'l L. 597, 599 (1963) ("There is not the slightest evidence that the framers of the United Nations Charter, by inserting one provision which expressly reserves a right of self-defense, had the intent of imposing by this provision new limitations upon the traditional right of states."); *see also* Abraham D. Sofaer, *International Law and Kosovo*, 36 Stan. J. Int'l L. 1, 16 (2000).[37] Instead, as we have explained at length elsewhere, article 51 merely reaffirms a right that already existed independent of the Charter. *See Boarding and Searching Foreign Vessels* at 10; *see also* D.W. Bowett, *Self-Defence in International Law* 187 (1958).

The customary international law right to use force in anticipatory self-defense is a well-established aspect of the "inherent right" of self-defense. As we explained forty years ago:

> The concept of self-defense in international law of course justifies more than activity designed merely to resist an armed attack which is already in progress. Under international law every state has, in the

---

[37] The negotiating history of the U.N. Charter reveals that the drafters did not intend for the prohibition on the use of force in article 2(4) to impair "the use of arms in legitimate self-defence." Bowett, *Self-Defence in International Law* at 182 (internal quotations omitted); *see also* Ruth B. Russell, *A History of the United Nations Charter: The Role of the United States, 1940-1945*, at 466 (1958) (states agreed at Dumbarton Oaks that "the Charter could not deny the inherent right of self-defense against aggression"). The genesis of article 51 was the desire to preserve the right of collective self-defense under regional arrangements such as the Act of Chapultepec, which incorporated the concept that an attack on one state in the region would be seen as an attack on all. *See* Report to the President on the Results of the San Francisco Conference by the Chairman of the United States Delegation and Secretary of State E.R. Stettinius, *reprinted in The Charter of the United Nations: Hearings Before S. Comm. on Foreign Relations*, 79th Cong. 34, 96-100 (1945) ("Report to the President") (article 51 designed to integrate regional arrangements with the establishment of a universal international organization); *see also* Dinstein, *War, Aggression and Self-Defense* at 161; *see generally* Russell, *History of the United Nations Charter* at 697-706. The Latin American states wanted to make the Act of Chapultepec's policy of collective defense, which was to last only until the end of World War II, permanent in a multilateral treaty, and article 51 was drafted in large part to ensure that the U.N. Charter did not interfere with that goal. Report to the President at 100. Moreover, the Senators who gave their advice and consent to the U.N. Charter were primarily concerned that it not interfere with the Monroe Doctrine. *See The Charter of the United Nations*, S. Exec. Rep. No. 79-8, at 10 (1945) (under article 51, "in the case of a direct act of aggression against an American country—that is, in the case of the first contingency contemplated in the Monroe Doctrine—the United States and the other American Republics could proceed at once to the assistance of the victim of the attack"). The purpose of article 51 was to protect the pre-existing right of self-defense, not to restrict it. *See* Bowett, *Self-Defence in International Law* at 188.

words of Elihu Root,[38] "the right . . . to protect itself by preventing a condition of affairs in which it will be too late to protect itself."

Memorandum for the Attorney General, from Norbert A. Schlei, Assistant Attorney General, Office of Legal Counsel, *Re: Legality under International Law of Remedial Action Against Use of Cuba as a Missile Base by the Soviet Union* at 2 (Aug. 30, 1962); *cf. Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 29 (1827) ("the [domestic] power to provide for repelling invasions includes the power to provide against the attempt and danger of invasion"). Thus, under existing Department of Justice opinions, the United States has the right under international law to use force against another state even before we actually come under armed attack, in order to prevent or forestall that attack. We now turn to the task of explaining the legal principles that give content to the doctrine of anticipatory self-defense.

### 1. The *Caroline* Test

The classic formulation of the right of anticipatory self-defense arose from the *Caroline* incident. In 1837, the steamer *Caroline* had been supplying armed insurgents against British rule in Canada with reinforcements of men and materials from the United States. In response, a British force from Canada entered U.S. territory at night, seized the *Caroline*, set the ship on fire, and launched it down Niagara Falls, killing two U.S. citizens in the process. The British claimed that they were acting in self-defense, and Secretary of State Daniel Webster called upon the British to show that the

> necessity of self-defence [was] instant, overwhelming, leaving no choice of means, and no moment of deliberation . . . [and that the British force], even supposing the necessity of the moment author- ized them to enter the territories of the United States at all, did noth- ing unreasonable or excessive; since the act, justified by the necessi- ty of self-defence, must be limited by that necessity, and kept clearly within it.

Letter for Henry Fox, British Minister in Washington, from Daniel Webster, Secretary of State (Apr. 24, 1841), *reprinted in* 1 *British Documents on Foreign Affairs: Reports and Papers from the Foreign Office Confidential Print*, pt. I, series C, 153, 159 (Kenneth Bourne ed., 1986) ("Webster Letter"). The next year, Lord Ashburton, who had been sent by the British as a special minister to resolve the *Caroline* dispute and other related matters, implicitly accepted this test by

---

[38] Elihu Root served as Secretary of War in President McKinley's Administration and as Secretary of State in President Theodore Roosevelt's Administration. He was also a Senator from New York and winner of the Nobel Peace Prize.

justifying Britain's actions in these terms. *See* Letter for Daniel Webster, Secretary of State, from Lord Ashburton (July 28, 1842), *reprinted in* 1 *British Documents on Foreign Affairs: Reports and Papers from the Foreign Office Confidential Print*, pt. I, series C, 332-35 (Kenneth Bourne ed., 1986). Although Secretary Webster disagreed that his test had been satisfied, viewing the burning of the ship in the middle of the night as an unnecessary and disproportionate response to the threat, he agreed to accept Great Britain's apology and dismiss the matter. *See* Letter for Lord Ashburton, from Daniel Webster, U.S. Secretary of State (Aug. 6, 1842), *reprinted in* 1 *British Documents on Foreign Affairs: Reports and Papers from the Foreign Office Confidential Print*, pt. I, series C, 346-47 (Kenneth Bourne ed., 1986); *see generally* R.Y. Jennings, *The Caroline and McLeod Cases*, 32 Am. J. Int'l L. 82, 82-91 (1938). Webster's formulation was reaffirmed a century later by the International Military Tribunal at Nuremberg when it ruled that the German invasion of Norway in 1940 was not defensive because it was unnecessary to prevent an "imminent" Allied invasion, and instead was an impermissible act of aggression because the primary objective of the invasion was to secure operational bases in Norway. *See International Military Tribunal (Nuremberg), Judgment and Sentences*, 41 Am. J. Int'l L. 172, 205 (1947) ("[P]reventive action in foreign territory is justified only in case of 'an instant and overwhelming necessity for self-defense, leaving no choice of means, and no moment of deliberation.'") (quoting the *Caroline* case); *see also* Bowett, *Self-Defence in International Law* at 142-43.

The *Caroline* test has been distilled into two principal requirements for legitimate self-defense. First, the use of force must be necessary because the threat is imminent and thus pursuing peaceful alternatives is not an option. Second, the response must be proportionate to the threat. *See* Bowett, *Self-Defence in International Law* at 53, 188-89; *see also* McDougal, *Soviet-Cuban Quarantine*, 57 Am. J. Int'l L. at 597-98.[39] International legal authorities seem to agree that necessity and proportionality apply to the use of force in all cases, not just in cases of self-defense.[40]

---

[39] The principle of proportionality requires that the force used be that which is needed to neutralize or eliminate the threat. *See* Myres S. McDougal & Florentino P. Feliciano, *Law and Minimum World Public Order: The Legal Regulation of International Coercion* 242-43 (1961); *see also* Oscar Schachter, *The Right of States to Use Armed Force*, 82 Mich. L. Rev. 1620, 1637 (1984). Proportionality permits the removal of the danger that justifies the use of force as being necessary. *See* Richard J. Grunawalt, *The JCS Standing Rules of Engagement: A Judge Advocate's Primer*, 42 A.F.L. Rev. 245, 251 (1997) (proportionality is "the degree of force, that is reasonable in terms of intensity, duration and magnitude, required to decisively counter the hostile act or demonstration of hostile intent that constitutes the necessity part of the equation—but no more than that"). As with necessity, the fundamental test is one of reasonableness. *See* McDougal & Feliciano, *Law and Minimum World Public Order* at 218.

[40] Similarly, the requirements of necessity and proportionality apply to any use of force in self-defense, whether in anticipation of an attack, or in response to an armed attack that has already occurred. In *Military and Paramilitary Activities in and Against Nicaragua (Nicar. v. U.S.)*, 1986 I.C.J.

## 2. Necessity

International law does not supply a precise or detailed definition of what it means for a threat to be sufficiently "imminent" to justify the use of force in self-defense as necessary. Even outside the use-of-force context, although the term "imminent" is used in a variety of international agreements, it is rarely defined.[41] Although the dictionary definition of "imminent" focuses on the temporal, *see Webster's Third New International Dictionary* 1130 (1993) (defining "imminent" as "ready to take place: near at hand: impending . . . hanging threateningly over one's head: menacingly near"), under international law the concept of imminence encompasses an analysis that goes beyond the temporal proximity of the threat.

The ICJ, for example, has attempted to define imminence in the context of the necessity doctrine as it relates to relieving a state of its international obligations. In *Gabčíkovo-Nagymaros Project (Hungary/Slovakia)*, 1997 I.C.J. 7 (Sept. 27), the ICJ addressed whether Hungary was justified in suspending work on the Gabcikovo-Nagymaros dam because of Hungary's fears regarding the environmental consequences of such work on the Danube. A treaty with Slovakia required Hungary to perform the work. The court considered whether Hungary's suspension of work was justified by a "state of necessity," which it defined by reference to article 33 of the Draft Articles on the International Responsibility of States adopted by the International Law Commission. *Id*. at 36-37 ¶ 50. The ICJ described article 33 as reflecting customary international law. *Id*. at 41-42 ¶ 52. Article 33 permits a state to invoke a state of necessity as a ground for failing to

---

14 (June 27), for example, the International Court of Justice ("ICJ"), reserving the issue of the appropriate use of force in anticipatory self-defense because the case concerned an armed attack that had already occurred, noted that "[t]he Parties also agree in holding that whether the response to the attack is lawful [under customary international law] depends on observance of the criteria of the necessity and the proportionality of the measures taken in self-defence." *Id*. at 103 ¶ 194; *see also id*. at 94 ¶ 176 (well established under customary international law that measures taken in self-defense must be necessary and proportional). The United States, however, refused to accept the jurisdiction of the ICJ in this case, filed no pleadings on the merits, and did not appear at oral argument. *Id*. at 20 ¶ 17. Nonetheless, the State Department Legal Adviser at the time, Abraham Sofaer, agreed with this formulation of customary international law, stating, "we recognize that force may be used only to deter or prevent aggression, and only to the extent it is necessary and proportionate." Abraham D. Sofaer, *Joint Luncheon With the Section of International Law and Practice of the American Bar Association*, 82 Am. Soc'y Int'l L. Proc. 420, 422 (1988), *reprinted in* 3 Marian Nash (Leich), *Cumulative Digest of United States Practice in International Law, 1981-1988*, 3388, 3389 (1995).

41 *See, e.g.*, Agreement between the United States of America and the Hashemite Kingdom of Jordan on the Establishment of a Free Trade Area art. 10(7), Oct. 24, 2000, 41 I.L.M. 63 (defining "threat of serious injury" as "serious injury that, on the basis of facts and not merely on allegation, conjecture or remote possibility, is clearly imminent"); United Nations Convention on the Law of the Sea art. 198, *opened for signature* Dec. 10, 1982, 1833 U.N.T.S. 397 (obligation to notify affected states when the marine environment is in "imminent danger of being damaged" by pollution); Convention for the Intervention on the High Seas in Cases of Oil Pollution Casualties art. 2, Nov. 29, 1969, 26 U.S.T. 765 (defining "maritime casualty" to include various occurrences resulting in "imminent threat of material damage" to a ship or cargo).

comply with an international obligation if, *inter alia*, "the act was the only means of safeguarding an essential interest of the State against a grave and imminent peril." *Id*. at 36 ¶ 50. The ICJ declared that

> "Imminence" is synonymous with "immediacy" or "proximity" and goes far beyond the concept of "possibility." As the International Law Commission emphasized in its commentary, the "extremely grave and imminent" peril must "have been a threat to the interest at the actual time." That does not exclude, in the view of the Court, that a "peril" appearing in the long term might be held to be "imminent" as soon as it is established, at the relevant point in time, that the realization of that peril, however far off it might be, is not thereby any less certain and inevitable.

*Id*. at 42 ¶ 54 (internal citations omitted).[42] The court thereby acknowledged that evaluating imminence requires an analysis of not just the timing, but also the probability of the threat.

In addition to the probability the threat will materialize, international law recognizes the need to evaluate the magnitude of harm the threat would cause. Over time, the advent of nuclear and other sophisticated weapons has dramatically increased the degree of potential harm to be factored in. Weapons of mass destruction threaten devastating and indiscriminate long-term damage to large segments of the civilian population and environment. As the ICJ explained in Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion, 1996 I.C.J. 226, 244 ¶ 36 (July 8), nuclear weapons possess unique characteristics, "in particular their destructive capacity, their capacity to cause untold human suffering, and their ability to cause damage to generations to come." In addition, the danger posed by WMD is exacerbated by the possibility that the means of delivery may be relatively unsophisticated—for example, a "dirty bomb" driven into a building by a suicide bomber, or the spread of a biological agent with an ordinary crop duster. At the same time, development of advanced missile technology has vastly improved the capability for stealth, rendering the threat of the weapons they deliver more imminent because there is less time to prevent their launch.

With these developments in offensive arms and their means of delivery, the calculus of whether a threat is sufficiently imminent to render the use of force necessary has evolved. Indeed, the importance of the temporal factor has diminished. As Professor Myres McDougal explained in 1963, referring to the necessity prong of the *Caroline* test: "[T]he understanding is now widespread that a test formulated in the previous century for a controversy between two friendly states is hardly relevant

---

[42] The ICJ found that, because the dangers cited by Hungary were uncertain, the alleged peril was not "imminent." *Id*. at 42-45 ¶¶ 55-56.

to contemporary controversies, involving high expectations of violence, between nuclear-armed protagonists." McDougal, *Soviet-Cuban Quarantine*, 57 Am. J. Int'l L. at 598; *see also* Mallison, *Limited Naval Blockade or Quarantine-Interdiction*, 31 Geo. Wash. L. Rev. at 348 ("In the contemporary era of nuclear and thermo-nuclear weapons and rapid missile delivery techniques, Secretary Webster's formulation could result in national suicide if it actually were applied instead of merely repeated."). Similarly, a supplement to the U.S. Navy's *Commander's Handbook on the Law of Naval Operations* explains that Daniel Webster's requirement of immediacy is "too restrictive today, particularly given the nature and lethality of modern weapons systems which may be employed with little, if any, warning." Oceans Law and Policy Dep't, Naval War College, *Annotated Supplement to the Commander's Handbook on the Law of Naval Operations* 4-13 ¶ 4.3.2.1 n.32 (1997) ("*Commander's Handbook Supplement*"), *available at* http://www.fichl.org/uploads/media/ US_Navy_Commander_s_Handbook_Annotated_Supplement_1997.pdf (last visited June 4, 2012). Nor does the *Caroline* test take into account the modern realities of international terrorism: "[T]he traditional theories of customary international law were developed in a completely different era, with no concern for the danger presented by a modern well-financed terrorist organization in a world of chemical, biological, and nuclear weapons capable of horrific destruction, and yet portable by a single individual. A terrorist 'war' does not consist of a massive attack across an international border . . . ." Gregory M. Travalio, *Terrorism, International Law, and the Use of Military Force*, 18 Wis. Int'l L.J. 145, 173 (2000).

### 3. State Practice

State practice since the development of nuclear weapons and sophisticated delivery systems confirms the evolution of the degree of imminence and proportionality that would justify the use of force in self-defense. Such practice is relevant because it is the source of customary international law. *See supra* Part III.A.3.

### a. Cuban Missile Crisis

During the Cuban Missile Crisis, for example, this Office adopted a more elastic concept of necessity than that articulated in the *Caroline* test. In that case, we labeled the secret establishment of long-range nuclear missile bases in Cuba by the Soviet Union as an "immediate threat" to U.S. security and found that the imposition of a blockade of offensive military equipment to Cuba was a justifiable act of self-defense. Memorandum, Office of Legal Counsel, *Re: Summary of Legal Justification of Quarantine of Shipment of Offensive Weapons and Material to*

*Cuba* at 1 (Oct. 23, 1962) (unsigned) ("Cuba Quarantine Memorandum");[43] *see also* Proclamation 3504: Interdiction of the Delivery of Offensive Weapons to Cuba, *Pub. Papers of Pres. John F. Kennedy* 809, 810 (Oct. 23, 1962) (ordering U.S. Armed Forces to interdict offensive weapons and associated materiel en route to Cuba "to defend the security of the United States"); White House Statement on Soviet Proposals Relating to International Security, *Pub. Papers of Pres. John F. Kennedy* 813, 813 (Oct. 27, 1962) (describing threat as "immediate"); McDougal, *Soviet-Cuban Quarantine*, 57 Am. J. Int'l L. at 601-03. *But cf.* Abram Chayes, Legal Adviser to the Secretary of State, *The Legal Case for U.S. Action on Cuba*, 47 Dep't St. Bull. 763, 764-65 (Nov. 1962) (arguing that the quarantine was justified because it was taken in accordance with a resolution of the Organization of American States and observing that "[t]he quarantine action was designed to deal with an imminent threat to our security"; "[b]ut the President . . . did not invoke article 51 or the right of self-defense"); *Commander's Handbook Supplement* at 41-13 ¶ 4.3.2.1 n.31 (U.S. government characterized Cuba quarantine as a sanction imposed under article 52 of the U.N. Charter rather than as self-defense).

The presence of nuclear weapons in the Cuban Missile Crisis changed the conception of the right to self-defense. Although the sudden and secret preparation of the missile bases undoubtedly "add[ed] to an already clear and present danger," Radio and Television Report to the American People on the Soviet Arms Buildup in Cuba, *Pub. Papers of Pres. John F. Kennedy* 806, 807 (Oct. 22, 1962), their positioning in Cuba constituted a less immediate temporal threat of armed attack on the United States than that contemplated by previous applications of the *Caroline* test because there was no indication that the Soviet Union would use them either immediately, or even in the near term.[44] President Kennedy explained our more elastic concept of imminence:

> We no longer live in a world where only the actual firing of weapons represents a sufficient challenge to a nation's security to constitute maximum peril. Nuclear weapons are so destructive and ballistic missiles are so swift, that any substantially increased possibility of their use . . . may well be regarded as a definite threat to peace.

---

[43] The opinion also focused on additional factors for justifying the blockade: it would not violate article 2(4) of the U.N. Charter because it would not threaten the territorial integrity or political independence of Cuba; it did not qualify under international law as an act of war; and it qualified as action under a regional arrangement sanctioned by article 52 of the U.N. Charter. Cuba Quarantine Memorandum at 2-4.

[44] Indeed, some commentators argue that in 1962 a direct Soviet attack would have been "inconceivable" because the nuclear balance of power so highly favored the United States. *See* Stanimir A. Alexandrov, *Self-Defense Against the Use of Force in International Law* 158-59 (1996).

*Id*. As the President articulated, as the magnitude of the possible harm caused by an attack increases, the probability that the attack will occur may be reduced and still justify an exercise of the right to anticipatory self-defense.[45]

### b. Osirak Reactor Strike

The analysis becomes more complicated, however, when the threat of attack comes not from deployable nuclear weapons, but from fixed facilities engaged in the production of WMD. In that situation, the potential harm that would be caused by an attack remains high, but the probability that it will occur is more remote. In 1981, for example, Israel attacked a nuclear reactor under construction in Iraq, claiming that the strike was justified as anticipatory self-defense because the reactor was intended to manufacture nuclear bombs and very soon would have become operational. Israel also emphasized the limited window of opportunity in which to strike—once the reactor became operational, an attack would have been impossible because it could not have been carried out without exposing the inhabitants of Baghdad to extensive lethal radioactive fallout. *See* U.N. SCOR, 2280th mtg. at 10-11, ¶ 95, U.N. Doc. S/PV.2280 (June 12, 1981) (statement of Israeli Ambassador to the U.N.). Nonetheless, the international community, including the United States, condemned the Israeli attack. President Reagan's displeasure, however, appears to have been centered on Israel's failure to consider other options. He acknowledged that Israel may have genuinely viewed its actions as self-defense. *See* The President's News Conference, *Pub*. *Papers of Pres*. *Ronald Reagan* 519, 520 (June 10, 1981); *see also* Statement and Remarks by the Department of State Spokesman (Fischer) at the Daily Press Briefing (June 8, 1981), *reprinted in* Am. Foreign Pol'y Current Documents 1981, Doc. 301, at 684 (1984) ("The United States Government condemns the reported Israeli air strike on the Iraqi nuclear facility, the unprecedented character of which cannot but seriously add to the already tense situation in the area.").

Two weeks after the raid, the Security Council unanimously adopted a resolution "[s]trongly condemn[ing]" the Israeli strikes as a "clear violation of the Charter of the United Nations and the norms of international conduct." S.C. Res. 487, ¶ 1, U.N. Doc. S/RES/487 (June 19, 1981). Several members of the Security Council quoted the *Caroline* test and argued that the attack did not meet the requirements for necessity, noting in particular that Israel had spent several months planning for the attack. *See* Martin A. Rogoff & Edward Collins, Jr., *The Caroline Incident and the Development of International Law*, 16 Brook. J. Int'l L. 493, 508-09 (1990). The Israeli Ambassador to the United Nations disagreed,

---

[45] For a discussion of the legality of the U.S. blockade, c*ompare* Cuba Quarantine Memorandum *and* McDougal, *Soviet-Cuban Quarantine*, 57 Am. J. Int'l L. 597 (Cuba quarantine was justified as self-defense), *with* Quincy Wright, *The Cuban Quarantine*, 57 Am. J. Int'l L. 546 (1963) (quarantine was not lawful act of self defense due to lack of an armed attack).

claiming that "[t]o assert the applicability of the *Caroline* principles to a State confronted with the threat of nuclear destruction would be an emasculation of that State's inherent and natural right of self-defence." U.N. SCOR, 2288th mtg. at 10, ¶ 80, U.N. Doc. S/PV.2288 (June 19, 1981). The United States voted for the resolution, with the caveat that it was imperfect, and that the U.S. determination that the strike violated the U.N. Charter was "based solely on the conviction that Israel failed to exhaust peaceful means for the resolution of this dispute." *Id.* at 16, ¶ 157; *cf.* Abraham D. Sofaer, *The Sixth Annual Waldemar A. Solf Lecture in International Law: Terrorism, the Law, and the National Defense*, 126 Mil. L. Rev. 89, 109 (1989) (writing as Legal Adviser to the Secretary of State) (noting "absence of any evidence that Iraq had launched or was planning to launch an attack that could justify Israel's use of force").[46]

### c. 1986 Strike Against Libya

Like the development of nuclear weapons, the rise in international terrorism has resulted in an expansion of the concept of imminence. For example, one aspect of the U.S. justification for the air strikes of April 14, 1986 against terrorist-related targets in Libya was the doctrine of anticipatory self-defense. The strikes were prompted in part by the terrorist bombing of the La Belle discotheque in Berlin on April 5, which was frequented by U.S. military personnel. The blast killed two people, including an American soldier, and injured over two hundred others, fifty of whom were Americans. President Reagan cited conclusive evidence that Libya had planned and executed the Berlin bombing, Address to the Nation on the United States Air Strike Against Libya, 1 *Pub. Papers of Pres. Ronald Reagan* 468 (Apr. 14, 1986), which was only the most recent in a long line of terrorist attacks against U.S. installations, diplomats, and citizens supported and directed by Muammar Qadhafi.[47] *Id.* at 468-69; *see generally President's Authority to Conduct Military Operations*, 25 Op. O.L.C. at 208-09 (listing attacks by Libya on U.S. interests). Several of these attacks had been planned to occur in the weeks immediately preceding the La Belle bombing. In addition, the United States had

---

[46] For a discussion of the legality of the Osirak attack, *compare* Timothy L.H. McCormack, *Self-Defense in International Law: The Israeli Raid on the Iraqi Nuclear Reactor* (1996) (attack justified), *and* Anthony D'Amato, *Israel's Air Strike Against the Osiraq Reactor: A Retrospective*, 10 Temp. Int'l & Comp. L.J. 259 (1996) (not justified as anticipatory self-defense but because Israel was acting as proxy for international community), *with* W. Thomas Mallison & Sally V. Mallison, *The Israeli Attack of June 7, 1981, Upon the Israeli Nuclear Reactor: Aggression and Self-Defense?*, 15 Vand. J. Transnat'l L. 417 (1982) (attack not justified).

[47] One of these attacks involved the firing by Libya of surface-to-air missiles at U.S. aircraft flying over international waters in the Gulf of Sidra. U.S. Armed Forces responded by taking "limited measures of self-defense necessary to protect themselves from continued attack." Letter to the Speaker of the House of Representatives and the President Pro Tempore of the Senate on the Gulf of Sidra Incident, 1 *Pub. Papers of Pres. Ronald Reagan* 406, 406 (Mar. 26, 1986).

clear evidence that Libya was planning a "multitude" of future attacks. U.N. SCOR, 2674th mtg. at 17, U.N. Doc. S/PV.2674 (Apr. 15, 1986) (statement of Ambassador Vernon A. Walters, U.S. Permanent Representative to the United Nations) ("Walters Statement").

The United States explained that the strikes on Libya were undertaken in self-defense and were fully consistent with article 51. *See* Address to the Nation on the United States Air Strike Against Libya, 1 *Pub. Papers of Pres. Ronald Reagan* 468, 469 (Apr. 16, 1986) ("Self-defense is not only our right, it is our duty."); Letter to the Speaker of the House of Representatives and the President Pro Tempore of the Senate on the United States Air Strike Against Libya, 1 *Pub. Papers of Pres. Ronald Reagan* 478 (Apr. 16, 1986); *see also* U.N. Doc. S/17990 (Apr. 14, 1986) ("The Libyan policy of threats and use of force is in clear violation of Article 2(4) of the United Nations Charter. It has given rise to the entirely justifiable response by the U.S."). We justified the strikes in large part as anticipatory self-defense.[48] President Reagan argued that the primary objective of the U.S. strikes was to forestall future terrorist attacks on the United States: "This necessary and appropriate action was a preemptive strike, directed against the Libyan terrorist infrastructure and designed to deter acts of terrorism by Libya, such as the Libyan-ordered bombing of a discotheque in West Berlin on April 5 [1986]." Letter to the Speaker of the House of Representatives and the President Pro Tempore of the Senate on the United States Air Strike Against Libya, 1 *Pub. Papers of Pres. Ronald Reagan* 478, 478 (Apr. 16, 1986); *see also* Walters Statement at 14-15 (strikes were designed to disrupt Libya's ability to carry out terrorist acts and to deter future such acts). In addition to the threat of future Libyan-sponsored terrorist attacks, the United States pointed to the exhaustion of nonmilitary remedies as meeting the customary international law standard of necessity. Address to the Nation on the United States Air Strike Against Libya, 1 *Pub. Papers of Pres. Ronald Reagan* 468, 469 (Apr. 14, 1986) ("We always seek peaceful avenues before resorting to the use of force—and we did. We tried quiet diplomacy, public condemnation, economic sanctions, and demonstrations of military force. None succeeded."). Moreover, President Reagan emphasized that the strikes were proportional—the targets "were carefully chosen, both for their direct linkage to Libyan support of terrorist activities and for the purpose of minimizing collateral damage and injury to innocent civilians." Letter to the

---

[48] The United States also justified the strikes as a response to what amounted to an armed attack by Libya on U.S. citizens. Address to the Nation on the United States Air Strike Against Libya, 1 *Pub. Papers of Pres. Ronald Reagan* 468, 469 (Apr. 14, 1986). Even before the La Belle bombing, President Reagan had argued that Libya's provision of material support to terrorist groups that attack U.S. citizens amounted to armed aggression under established principles of international law. The President's News Conference, 1 *Pub. Papers of Pres. Ronald Reagan* 17 (Jan. 7, 1986); *see also* Address of Secretary of State George Shultz, *Low-Intensity Warfare: The Challenge of Ambiguity*, 86 Dep't St. Bull. 15, 17 (Mar. 1986).

Speaker of the House of Representatives and the President Pro Tempore of the Senate on the United States Air Strike Against Libya, 1 *Pub. Papers of Pres. Ronald Reagan* 478, 478 (Apr. 16, 1986). Although several countries criticized the U.S. strikes, supporting a UNSCR condemning the attack as a violation of the U.N. Charter, Australia, Denmark, France, and Britain and Northern Ireland joined the United States in vetoing the resolution. U.N. SCOR, 2682nd mtg., U.N. Doc. S/PV.2682 (Apr. 21, 1986).[49]

### d. 1989 Intervention in Panama

The United States again responded in self-defense to an imminent threat to U.S. lives when it took military action in Panama on December 20, 1989. Shortly before the U.S. military action, Panama's National Assembly of Representatives (a 510-member body appointed by General Manuel Noriega) had declared that a state of war existed between Panama and the United States, and General Noriega had delivered an inflammatory anti-American speech. A few days earlier, Panamanian armed forces had killed an unarmed U.S. Marine officer, beat an unarmed U.S. Naval officer, and physically abused and threatened the Navy officer's wife. The combination of "General Noriega's reckless threats and attacks upon Americans in Panama [had] created an imminent danger to the 35,000 American citizens in Panama." Address to the Nation Announcing United States Military Action in Panama, 2 *Pub. Papers of Pres. George Bush* 1722, 1723 (Dec. 20, 1989). As President Bush explained: "The deployment of U.S. Forces is an exercise of the right of self-defense recognized in Article 51 of the United Nations Charter and was necessary to protect American lives in imminent danger . . . ." Letter to the Speaker of the House of Representatives and the President Pro Tempore of the Senate on United States Military Action in Panama, 2 *Pub. Papers of Pres. George Bush* 1734, 1734 (Dec. 21, 1989). According to the State Department spokesperson, the "right of self-defense entitles the United States to take necessary measures to defend U.S. military personnel, U.S. nationals, and U.S. installations." Marian Nash Leich, *Contemporary Practice of the United States Relating to International Law: Use of Force*, 84 Am. J. Int'l L. 545, 548 (1990).[50] The United

---

[49] For a discussion of the legality of the strikes, *compare* Sofaer, *Terrorism, the Law, and the National Defense*, 126 Mil. L. Rev. 89 (strikes justified as self-defense), *and* Major Wallace F. Warriner, *The Unilateral Use of Coercion Under International Law: A Legal Analysis of the United States Raid on Libya on April 14, 1986*, 37 Naval L. Rev. 49 (1988) (same), *and* Gregory Francis Intoccia, American Bombing of Libya: An International Legal Analysis, 19 Case W. Res. J. Int'l L. 177 (1987) (same), *with* Major Michael Lacey, *Self-Defense or Self-Denial: The Proliferation of Weapons of Mass Destruction*, 10 Ind. Int'l & Comp. L. Rev. 293 (2000) (attacks not justified as self-defense), *and* Christopher Greenwood, *International Law and the United States' Air Operation Against Libya*, 89 W. Va. L. Rev. 933 (1987) (attacks probably not justified as self-defense).

[50] The United States also justified its actions as self-defense resulting from the armed attacks against U.S. citizens. U.N. Doc. S/21035 (Dec. 20, 1989). In addition to protecting U.S. citizens, the

States noted that they had "exhausted every available diplomatic means to resolve peacefully disputes with Mr. Noriega, who has rejected all such efforts." U.N. Doc. S/21035 (Dec. 20, 1989). The United States assured the Security Council that the use of force would be proportionate, *id.*, and President Bush chose removing Noriega from power as the only way to protect U.S. citizens in Panama. *Cf.* Abraham D. Sofaer, *The Legality of the United States Action in Panama*, 29 Colum. J. Transnat'l L. 281, 290 (1991). In the midst of the fighting, the Security Council considered a draft resolution that would have labeled the invasion as "a flagrant violation of international law," but Great Britain, France, and Canada joined the United States in vetoing the resolution. U.N. Doc. S/21048 (Dec. 22, 1989); U.N. SCOR, 2902nd mtg., U.N. Doc. S/PV.2902 (Dec. 23, 1989).[51]

### e. 1993 Strike Against Iraq

The United States justified the June 1993 strike on Iraqi intelligence service headquarters, which was undertaken in response to "compelling evidence" that Iraq had attempted to assassinate President George H.W. Bush two months earlier, as an exercise of the inherent right of self-defense as recognized in article 51 of the United Nations Charter. Letter to Congressional Leaders on the Strike on Iraqi Intelligence Headquarters, 1 *Pub. Papers of Pres. William J. Clinton* 940, 940 (June 28, 1993). President Clinton explained the necessity for U.S. action:

> The evidence of the Government of Iraq's violence and terrorism demonstrates that Iraq poses a continuing threat to United States nationals and shows utter disregard for the will of the international community as expressed in Security Council Resolutions and the United Nations Charter. Based on the Government of Iraq's pattern of disregard for international law, I concluded that there was no reasonable prospect that new diplomatic initiatives or economic measures could influence the current Government of Iraq to cease planning future attacks against the United States.

---

invasion had three other objectives: (1) helping to restore democracy in Panama, (2) protecting the integrity of the Panama Canal Treaties, and (3) bringing Noriega to justice. *See* Ved P. Nanda, *The Validity of United States Intervention in Panama Under International Law*, 84 Am. J. Int'l L. 494, 494 (1990) (quoting a statement by President Bush on January 3, 1990).

[51] For a discussion of the legality of the U.S. military action, *compare* Louis Henkin, *The Invasion of Panama Under International Law: A Gross Violation*, 29 Colum. J. Transnat'l L. 293 (1991) (intervention violated international law), *and* Ved P. Nanda, *The Validity of United States Intervention in Panama Under International Law*, 84 Am. J. Int'l L. 494 (1990) (U.S. intervention in Panama violated international law on the use of force, in part because it failed to show necessity), *and* Tom J. Farer, *Panama: Beyond the Charter Paradigm*, 84 Am. J. Int'l L. 503 (1990), *with* Abraham D. Sofaer, *The Legality of the United States Action in Panama*, 29 Colum. J. Transnat'l L. 281 (1991) (U.S. action did not violate Article 2(4) of the U.N. Charter).

*Id*.[52] The objective of the strikes was to diminish Iraq's capability to support violence against the United States and others, and "to deter Saddam Hussein from supporting such outlaw behavior in the future." Address to the Nation on the Strike on Iraqi Intelligence Headquarters, 1 *Pub. Papers of Pres. William J. Clinton* 938, 938 (June 26, 1993).[53] President Clinton described the strikes as "limited and proportionate." Letter to Congressional Leaders, 1 *Pub. Papers of Pres. William J. Clinton* at 941 (June 28, 1993). The reaction of the Security Council was largely favorable, and its members rejected the plea of the Iraqi ambassador that the Council condemn the U.S. action as an act of aggression against Iraq. *See* Julia Preston, *Security Council Reaction Largely Favorable to U.S. Raid*, Wash. Post, June 28, 1993, at A12.[54]

### f. 1998 Attack on Afghanistan and Sudan

On August 7, 1998, terrorists bombed the U.S. embassies in Kenya and Tanzania, killing over 250 people, including twelve Americans. Two weeks later, based on "convincing information from a variety of reliable sources" that the Osama bin Laden organization was responsible for these bombings, the United States launched cruise missile attacks against terrorist training camps and installations in Afghanistan used by that organization and against a facility in Sudan being used to produce materials for chemical weapons. Letter to Congressional Leaders Reporting on Military Action Against Terrorist Sites in Afghanistan and Sudan, 2 *Pub. Papers of Pres. William J. Clinton* 1464 (Aug. 21, 1998). President Clinton explained the international law justification for the strikes:

---

[52] The strikes were also justified as a response to an attack against the United States. *See* Address to the Nation on the Strike on Iraqi Intelligence Headquarters, 1 *Pub. Papers of Pres. William J. Clinton* 938, 938 (June 26, 1993) ("the Iraqi attack against President Bush was an attack against our country and against all Americans").

[53] Similarly, the January 17, 1993 strike on a nuclear facility in Baghdad, while primarily designed to encourage Iraq to comply with its obligations under UNSCRs, was undertaken in part to prevent the facility from being used again to support Iraq's nuclear weapons program. *See* Letter to Congressional Leaders Reporting on Iraq's Compliance with United Nations Security Council Resolutions, 2 *Pub. Papers of Pres. George Bush* 2269, 2269-70 (Jan. 19, 1993).

[54] For a discussion of the legality of the U.S. strikes, *compare* Robert F. Teplitz, Note, *Taking Assassination Attempts Seriously: Did the United States Violate International Law in Forcefully Responding to the Iraqi Plot to Kill George Bush?*, 28 Cornell Int'l L.J. 569, 606-07 (1995) (U.S. action was a legitimate use of force in self-defense), *with* Ryan C. Hendrickson, *Article 51 and the Clinton Presidency: Military Strikes and the U.N. Charter*, 19 B.U. Int'l L.J. 207 (2001) (1993 strikes did not satisfy requirements of anticipatory self-defense), *and* John Quigley, *Missiles With a Message: The Legality of the United States Raid on Iraq's Intelligence Headquarters*, 17 Hastings Int'l & Comp. L. Rev. 241 (1994) (same), *and* Dino Kritsiotis, *The Legality of the 1993 US Missile Strike on Iraq and the Right of Self-Defence in International Law*, 45 Int'l & Comp. L.Q. 162 (1996) (impossible to determine legality of strikes).

> The United States acted in exercise of our inherent right of self-defense consistent with Article 51 of the United Nations Charter. These strikes were a necessary and proportionate response to the imminent threat of further terrorist attacks against U.S. personnel and facilities. These strikes were intended to prevent and deter additional attacks by a clearly identified terrorist threat.

*Id.*; *see also* Remarks in Martha's Vineyard, Massachusetts, on Military Action Against Terrorist Sites in Afghanistan and Sudan, 2 *Pub. Papers of Pres. William J. Clinton* 1460 (Aug. 20, 1998) (noting the existence of "compelling information" that additional terrorist attacks against U.S. citizens were being planned, and that the groups affiliated with bin Laden were seeking to acquire chemical and other dangerous weapons). As Professor Wedgwood recognized: "Even by the demanding test of the *Caroline . . .* the danger of renewed assault [by bin Laden's network] justified immediate action." Ruth Wedgwood, *Responding to Terrorism: The Strikes Against bin Laden*, 24 Yale J. Int'l L. 559, 565 (1999). In its report to the Security Council after the strikes, the United States emphasized that the attacks were undertaken only after repeated warnings to Afghanistan and Sudan that they must stop harboring and supporting terrorist groups such as bin Laden's organization. U.N. Doc. S/1998/780 (Aug. 20, 1998).[55] The response of the international community was mixed, but the Security Council took no formal action in response to the attacks. *See* Jack M. Beard, *America's New War on Terror: The Case for Self-Defense Under International Law*, 25 Harv. J.L. & Pub. Pol'y 559, 563-64 (2002).[56]

In sum, recent practice demonstrates that the United States has used force in response to a threat of aggression that is less imminent in the temporal sense than described by Secretary Webster over 150 years ago. Rapid advances in weapons technology have changed the calculus, in large part because a state cannot defend itself if it waits until such weapons are launched.

The new threat of nuclear weapons apparently is not, however, sufficient to erase completely any requirement of temporality. For example, the international community did not consider the threat posed by an Iraqi nuclear reactor before it had become operational to be sufficient to justify its destruction by Israel in 1981. Nonetheless, the backdrop against which the threat to Israel was evaluated has changed significantly in the past twenty years. In 1981, Iraq was permitted to have

---

[55] The United States also justified the strikes as a response in self-defense to the embassy attacks. *Id.*

[56] For a discussion of the legality of the U.S. strikes, *compare* Wedgwood, *Responding to Terrorism*, 24 Yale J. Int'l L. 559 (1998 strikes justified as proportionate self-defense), *and* Hendrickson, *Article 51 and the Clinton Presidency*, 19 B.U. Int'l L.J. 207 (attacks justified under Article 51), *with* Jules Lobel, *The Use of Force to Respond to Terrorist Attacks: The Bombing of Sudan and Afghanistan*, 24 Yale J. Int'l L. 537 (1999) (attacks not justified).

nuclear materials under the safeguards of the IAEA, and Saddam Hussein had not yet used chemical weapons against Iran and his own people, militarily invaded an innocent neighbor, or spent over a decade flouting his country's international obligations to destroy and cease to develop WMD and their means of delivery. In other words, the imminence of a likely attack by Iraq has increased since 1981 because Iraq has demonstrated a WMD capability and a willingness to use it. Moreover, even at the time of the Osirak attack, some international law scholars believed that, were Israel's argument that it acted in the last window of opportunity to be true, the attack would have qualified as lawful self-defense, even if the materialization of the threat—the development of a nuclear bomb by Iraq—were as many as five years away. *See The Israeli Air Strike: Hearings before the S. Comm. on Foreign Relations*, 97th Cong. 251-52 (1981) (statement of Professor John Norton Moore).

The rise of international terrorism, characterized by unpredictable, sporadic, quick strikes against civilians, *see* Travalio, *Terrorism, International Law, and the Use of Military Force*, 18 Wis. Int'l L.J. at 173, similarly has expanded the elasticity of the imminence requirement. If a state waits until a terrorist attack is on the verge of being launched, it likely will be unable to protect the civilians who are being targeted, especially in light of the mentality of suicide bombers, who are immune to traditional methods of deterrence. Terrorists are also difficult to locate and track, and seek to escape detection by concealing themselves and their activities among an innocent civilian population. As terrorists burrow more deeply into the population, defensive options may become more limited. Due to these considerations, a state may need to act when it has a window of opportunity to prevent a terrorist attack and simultaneously minimize civilian casualties. *See* Michael N. Schmitt, *State-Sponsored Assassination in International and Domestic Law*, 17 Yale J. Int'l L. 609, 648 (1992). The United States acted in self-defense to prevent future terrorist strikes in 1986, 1993 and 1998, even though the attacks it sought to prevent were in the planning rather than the implementation stage. As Secretary of State Shultz explained in the context of the conflict with Libya in the mid-1980s:

> A nation attacked by terrorists is permitted to use force to prevent or preempt future attacks . . . . The law requires that such actions be necessary and proportionate. But this nation has consistently affirmed the rights of states to use force in exercise of their right of individual or collective self-defense.
>
> The UN Charter is not a suicide pact.

Shultz, *Low-Intensity Warfare*, 86 Dep't St. Bull. at 17 (Mar. 1986).

Finally, we note that U.S. military action in Panama, which was not in response to the threat of WMD or international terrorism, demonstrates that the degree of

imminence required to justify the use of force in self-defense has broadened even in response to conventional threats. Although the attacks by Panamanian forces on unarmed U.S. military personnel and Noriega's anti-American rhetoric indicated that future attacks on the 35,000 Americans in Panama were likely, the threat does not appear to have been one that was "instant, overwhelming, leaving no choice of means, and no moment of deliberation." Webster Letter at 159. The Panama precedent also reveals that, when using force in self-defense, the removal of a world leader from power, or "regime change," may be a proportionate response to the threat posed by that leader.

## 4. The Current Test

The use of force in anticipatory self-defense must be necessary and proportional to the threat. As outlined above, however, we believe that, at least in the realm of WMD and international terrorism, the test for determining whether a threat is sufficiently "imminent" to render the use of force necessary at a particular point has become more nuanced than Secretary Webster's nineteenth-century formulation. Factors to be considered include: the probability of an attack; the likelihood that this probability will increase, and therefore the need to take advantage of a window of opportunity;[57] whether diplomatic alternatives are practical;[58] and the magnitude of the harm that could result from the threat. *See* Travalio, *Terrorism, International Law, and the Use of Military Force*, 18 Wis. Int'l L.J. at 172 (while use of force in self-defense against terrorists need not meet the *Caroline* standard for imminence, "there must be a substantial likelihood that the threat will become manifest before it can be eliminated by means other than the use of military force"). If a state instead were obligated to wait until the threat were truly imminent in the temporal sense envisioned by Secretary Webster, there is a substantial danger of missing a limited window of opportunity to prevent widespread harm to civilians. As the President recently cautioned: "If we wait for threats to fully materialize, we will have waited too long." Press Release, The White House, President Bush Delivers Graduation Speech at West Point (June 1, 2002), *available at* http://georgewbush-whitehouse.archives.gov/news/releases/2002/06/20020601-3.html (last visited June 5, 2012). Finally, in an age of

---

[57] A similar concept exists for self-defense in the individual criminal context. Many states require that, in order for force to be justified as self-defense, the threat of harm must be "imminent." That does not mean, however, that the victim must wait until the final moment before a threatened harm materializes. If the harm cannot necessarily be avoided by waiting for the last moment, force may be used as early as is required for the victim to defend himself effectively. *See* 2 Paul H. Robinson, *Criminal Law Defenses* § 131(c)(1) (1984).

[58] *See* McDougal & Feliciano, *Law and Minimum World Public Order* at 231 (The degree of imminence must be "so high . . . as to preclude effective resort by the intended victim to non-violent modalities of response."); Bowett, *Self-Defence in International Law* at 53 (force may be used in self-defense only when no alternate means of protection are available).

technologically advanced delivery systems and WMD, international law cannot require that we ignore the potential harm represented by the threat.

## 5. Iraq

Applying the reformulated test for using force in anticipatory self-defense to the potential use of force against Iraq reveals that it may well be reasonable for the President to determine that the threat of a WMD attack by Iraq, either directly or through Iraq's support for terrorism,[59] is sufficiently "imminent" to render the use of force necessary to protect the United States, its citizens, and its allies.

First, based on Iraq's WMD capability and Saddam Hussein's previous use of WMD against both his enemies and his own people, the President could find that there is a high probability that he will use them again. Prior to the Persian Gulf War and the subsequent adoption of UNSCR 687 and the U.N. inspection regime in 1991, Iraq possessed a significant, extensive WMD capability. Saddam Hussein employed chemical weapons against Iranian troops and civilians during the Iran-Iraq war, and he used nerve gas against Kurdish civilians in northern Iraq in 1988, killing nearly 5,000 men, women and children. *See* Bureau of Political Military Affairs, U.S. Department of State, *Chronology of Events Leading to the U.S.-Led Attack on Iraq* (Jan. 8, 1999), *available at* http://www.state.gov/www/regions/nea/iraqchronyr.html (last visited June 5, 2012). Saddam Hussein also has revealed his willingness to use biological weapons. *See* Wedgwood, *Enforcement of Security Council Resolution 687*, 92 Am. J. Int'l L. 724; Report of the Secretary-General on the Status of the Implementation of the Special Commission's Plan for the Ongoing Monitoring and Verification of Iraq's Compliance with Relevant Parts of Section C of Security Council Resolution 687 (1991), UN Doc. S/1995/864, at 26-27 ¶ 75(w) (Oct. 11, 1995). Moreover, Iraq attempted to assassinate former President Bush in 1993. In addition, after the September 11th attacks, the official Iraqi news station stated that the United States was "reaping the fruits of [its] crimes against humanity." U.S. Department of State, *Patterns of Global Terrorism*

---

[59] There is no question that Iraq's state sponsorship of terrorism violates international law. In response to the terrorist attacks of September 11, 2001, the Security Council recently reaffirmed that all nations have a duty to refrain from sponsoring terrorist acts in another state or even "acquiescing in organized activities within its territory directed towards the commission of such acts." S.C. Res. 1373, pmbl. ¶ 9, U.N. Doc. S/RES/1373 (Sept. 28, 2001); *see also* S.C. Res. 748, pmbl. ¶ 6, U.N. Doc. S/RES/748 (Mar. 31, 1992) (reaffirming that such a duty stems from article 2(4) of the U.N. Charter). Again, in the words of Secretary Shultz:

> There should be no confusion about the status of nations that sponsor terrorism against Americans and American property. There is substantial legal authority for the view that a state which supports terrorist or subversive attacks against another state, or which supports or encourages terrorist planning and other activities within its own territory, is responsible for such attacks.

*Low-Intensity Warfare*, 86 Dep't St. Bull. at 17 (Mar. 1986).

*2001*, at 65 (May 2002) ("*Patterns of Global Terrorism*"), *available at* http://www.state.gov/j/ct/rls/crt/2001/ (last visited June 5, 2012). Iraq has a long history of using weapons of mass destruction.

The Central Intelligence Agency recently assessed that Iraq has the capability to reinitiate its chemical weapons programs within a few weeks or months. Central Intelligence Agency, *Unclassified Report to Congress on the Acquisition of Technology Relating to Weapons of Mass Destruction and Advanced Conventional Munitions, 1 January Through 30 June 2001*, at 3 (2002) ("CIA Report"), *available at* https://www.cia.gov/library/reports/archived-reports-1/jan_jun2002.html (last visited June 5, 2012). In addition, the Administration has stated that it strongly suspects that Iraq has used the time without U.N. inspections to improve all phases of its offensive biological weapons program. *See* John R. Bolton, Under Secretary of State for Arms Control and International Security, *Remarks to the 5th Biological Weapons Convention RevCon Meeting* (Nov. 19, 2001), *available at* http://2001-2009.state.gov/t/us/rm/janjuly/6231.htm (last visited June 5, 2012); *see also* CIA Report at 4 (UNSCOM believes that Iraq maintains a knowledge base and industrial infrastructure that could be used to produce quickly a large number of biological agents at any time). The Intelligence Community also is concerned that Iraq is reconstituting its nuclear weapons program. CIA Report at 4-5. Finally, Iraq has refurbished trainer aircraft that are believed to have been modified to deliver chemical and biological warfare agents. *Id*.

Second, although we do not have available the information regarding whether the use of force against Iraq at a particular time would be necessary to take advantage of a window of opportunity to prevent the threat of a WMD attack from materializing, the State Department has reported that a growing number of terrorist groups are interested in acquiring and using WMD to rival the attacks of September 11. *See Patterns of Global Terrorism* at 66. The President could determine that, were we to wait until after Iraq has transferred WMD to terrorist groups, it would be very difficult to determine where and when WMD would be used, given the sporadic nature of terrorist attacks and the terrorist tactic of infiltrating the civilian population. Moreover, the President could reasonably conclude that pursuing diplomatic remedies is not a practical alternative given that the United States has engaged in more than a decade of unsuccessful attempts to work through the United Nations to obtain Iraqi compliance with its disarmament obligations under UNSCR 687.

Third, as we have discussed earlier, the degree of harm that could result from Iraq's use of WMD could well be catastrophic. The combination of the vast potential destructive capacity of WMD and the modest means required for their delivery make them more of a threat than the military forces of many countries. *See* Travalio, *Terrorism, International Law, and the Use of Military Force*, 18 Wis. Int'l L.J. at 155; *see also* Wedgwood, *Responding to Terrorism*, 24 Yale J.

Int'l L. at 560 ("The indiscriminate nature of [biological] weapons and their extraordinary range of destruction multiplies the threat."). Chemical weapons and biological agents are easy to hide, and small quantities can have a devastating effect on the civilian population. Perhaps even more frightening is the tinder-box that would result were Iraq to transfer WMD to terrorists.

We observe, therefore, that even if the probability that Iraq itself would attack the United States with WMD, or would transfer such weapons to terrorists for their use against the United States, were relatively low, the exceptionally high degree of harm that would result, combined with a limited window of opportunity and the likelihood that if we do not use force, the threat will increase, could lead the President to conclude that military action is necessary to defend the United States.

Were the President to determine that the use of force in self-defense is necessary to counter the threat posed by Iraq's WMD program, such force should be proportional; in other words, it should be limited to that which is needed to eliminate the threat posed by Iraq. The President could reasonably determine that such proportionate response might include destruction of Iraq's WMD capability or removing Saddam Hussein from power. Finally, to the extent that the President were to have credible evidence that Saddam Hussein was giving WMD to the terrorists responsible for the September 11th attacks, the use of force against Iraq also would be justified as an exercise of self-defense expressly contemplated by article 51: responding to an armed attack. There is no doubt that the events of September 11th qualify as an "armed attack" under international law. *See* Sean D. Murphy, *Terrorism and the Concept of "Armed Attack" in Article 51 of the U.N. Charter*, 43 Harv. Int'l L. J. 41, 47-51 (2002); *cf.* Wedgwood, *Responding to Terrorism*, 24 Yale J. Int'l L. at 564 ("[T]he massacre of civilians and destruction of facilities in Kenya and Tanzania must qualify as an armed attack [warranting self-defense under Article 51].").

## IV. Conclusion

The President has broad authority under domestic law to use military force against Iraq. The Constitution grants the President unilateral power to take military action to protect the national security interests of the United States. In the case of Iraq, the President's independent constitutional authority is supplemented by Public Law 102-1, Public Law 105-235, and Public Law 107-40. While congressional authorization is not needed before the President may direct the use of force against Iraq to protect our national security, were he to do so pursuant to any or all of these provisions, he would be acting with approval previously granted by Congress.

In addition, international law authorizes the President to use force against Iraq on two independent grounds. First, the Security Council has authorized military action against Iraq to implement the terms of the cease-fire, and in response to the

threat to international peace and security caused by Iraq's repression of its civilian population. Due to Iraq's material breaches of the cease-fire, established principles of international law—both treaty and armistice law—currently permit the United States to suspend its terms and use force to compel Iraqi compliance with its disarmament and inspection requirements or redress any threat to international peace and security caused by Iraq's repression of its civilian population. Such a use of force would be consistent with U.S. practice. Second, international law also permits the President to use force against Iraq in anticipatory self-defense if the use of force would be both necessary due to an imminent threat, and a proportional response to that threat.

JAY S. BYBEE
*Assistant Attorney General*
*Office of Legal Counsel*